**TRAVELLERS INTERNATIONAL AG**
**and Windsor Inc., Plaintiffs,**

v.

**TRANS WORLD AIRLINES,**
**INC., Defendant.**

No. 88 Civ. 1484 (RJW).

United States District Court,
S.D. New York.

Oct. 13, 1989.

Seward & Kissel, New York City; Eugene P. Souther, of counsel and Lewis & Rice, St. Louis, Mo.; Robert S. Allen, Allen S. Boston, and Richard B. Walsh, of counsel, for plaintiffs.

Weil Gotshal & Manges, New York City; Irwin H. Warren, Richard B. Friedman, Miranda Schiller, and Isaac M. Jaroslawicz, of counsel and Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for defendant.

1. Familiarity with Judge Sweet's opinion is presumed. The opinion, entitled *Travellers Inter-*

## OPINION

ROBERT J. WARD, District Judge.

Plaintiffs, Travellers International A.G. ("Travellers" or "TI") and Windsor, Inc. ("Windsor"), seek permanently to enjoin defendant, Trans World Airlines, Inc. ("TWA"), from terminating the contract of November 26, 1984 between Travellers and TWA (the "Contract"). For the reasons that follow, the request for a permanent injunction is granted.

## BACKGROUND

This action was filed by plaintiffs in the Circuit Court for the City of St. Louis on November 4, 1987. TWA removed the lawsuit to the United States District Court for the Eastern District of Missouri on November 30, 1987. On February 29, 1988, a motion to transfer the case to the United States District Court for the Southern District of New York was granted and on March 4, 1988, the action was transferred to this Court.

Travellers moved this Court by order to show cause for a preliminary injunction. The motion was referred to Judge Robert W. Sweet, the Part I judge, because this Court was engaged in a lengthy criminal trial. In March 1988, Judge Sweet held six days of hearings on the request for a preliminary injunction. On April 20, 1988, Judge Sweet issued a thorough and well-reasoned opinion which preliminarily enjoined TWA from terminating the Contract and directed the parties to continue to perform the Contract according to past practices.[1] An Order to this effect was signed by Judge Sweet on April 27, 1988. TWA's motion to amend the April 20, 1988 opinion was denied by Judge Sweet in a Memorandum Opinion dated August 2, 1988.

After the completion of discovery, this Court conducted a bench trial on February 27-28, March 1-4 and 14-17, 1989 to determine plaintiffs' entitlement to a per-

*national AG v. Trans World Airlines,* is reported at 684 F.Supp. 1206 (S.D.N.Y.1988).

manent injunction.[2] Pursuant to Rule 65(a)(2), Fed.R.Civ.P., the evidence adduced at the hearing held by Judge Sweet on the motion for a preliminary injunction was admitted as part of the record for this proceeding.[3] Based upon the evidence presented during the six days of testimony at the preliminary injunction hearing and the evidence adduced during the ten days of testimony at the bench trial, the Court makes the following findings of facts and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

Travellers, a Swiss corporation with its principal place of business in London, England, is wholly owned by Windsor, a Missouri corporation with its principal place of business in St. Louis County, Missouri. Barney Ebsworth ("Ebsworth") is the sole shareholder of Windsor. TWA is a Delaware corporation with its principal place of business in New York. Carl Icahn ("Icahn"), who acquired control of TWA in the fall of 1985, is Chairman of its Board of Directors and its Chief Executive Officer.

*The Getaway Tours*

The relationship between Travellers and TWA began more than twenty (20) years ago, when both corporations were controlled by different owners. Travellers is in the vacation tour business. It contracts with hotels and other service providers in order to develop and operate tours in various countries. TWA is an international airline. In the early 1970's, TWA commenced its "Getaway Tours" to Europe. TWA, through the Getaway Tours, offered air transportation to passengers purchasing land tour packages. TWA owns the Getaway mark and the Getaway Tours are proprietary to it.

Beginning in 1972, Travellers sold tours to TWA, which TWA marketed as Getaway Tours. Pursuant to a written agreement between the two companies, Travellers was responsible for developing and operating the land tour packages of the Getaway Tours (the "Tours"). In 1974, Travellers and TWA entered into a Land Agreement and a Brochure Agreement, each dated April 25, 1974 (the "1974 Agreements"). The 1974 Agreements were the first in a series of successive long term contracts under which TWA was to provide air transportation for the Tours, market the Tours, wholesale the Tours to independent travel agents, and accept reservations directly for the Tours, while Travellers was to continue to develop and operate the land arrangements and to produce promotional brochures for the Tours. The brochures were to be used as selling tools by travel agents and TWA.

On or about June 6, 1979, Travellers and TWA entered into two additional agreements (the "1979 Agreements"), continuing their basic relationship. The most recent written agreement between the parties, entered into on or about November 26, 1984, relates to both Tours and brochures and is the Contract at the center of this litigation. The Contract covers the five year period from 1986 to 1991. Obligations under the Contract concerning the brochures commenced on January 1, 1986 with respect to brochures that were to be produced by Travellers and delivered to TWA for the 1987 tour season, and continued through 1990 with respect to brochures for the 1991 tour season. Obligations under the Contract concerning the Tours commenced on November 1, 1986 and continued until December 31, 1991. The parties operated pur-

---

**2.** The parties agreed that the damage claims asserted in this action would be severed and tried at a later date. An Order was entered to this effect on November 1, 1988.

**3.** Issues decided by a court at a preliminary injunction hearing are "open for review, but they should be adhered to, unless it clearly appears that an error was committed, or that additional facts were brought out at trial which demand a modification or reversal of the views expressed at the preliminary hearing." *Yonkers Raceway v. Standardbred Owners Ass'n,* 21

F.R.D. 3, 6 (S.D.N.Y.1957) (citation omitted). At trial, the Court allowed the parties to adduce whatever new evidence they had concerning the issues previously decided by Judge Sweet, as well as those issues still left open after Judge Sweet's Opinion. For those issues on which no new evidence was presented at trial, the Court, after reviewing the transcript of the preliminary injunction hearing, concludes that Judge Sweet's findings were amply supported by the record and therefore concurs in those findings in this decision.

suant to the 1979 Agreements until the effective dates specified in the Contract.

The Contract provided that Travellers was to advise TWA on marketing, advertising, development of new Tour products, preparation of promotional budgets, projection of expenses and revenues and production and distribution of brochures. The Contract also required the parties annually to reach agreement on the Tour itineraries and the prices and quality of the Tour packages.

Paragraph 5 of the Contract specified that TWA would:

> produce and distribute brochures for the Tours in such numbers as are deemed appropriate to produce the number of Tour passengers desired by TWA and TI, such desired number of Tour passengers to be mutually agreed upon for each year by TWA and TI, but in no event to be less than 100,000 per year.

Furthermore, TWA was obligated to advertise the Tours, wholesale the Tours to travel agents and make retail sales of the Tours at TWA's own sales office or through other distribution channels. The parties agreed that the Contract would be governed and construed according to New York law.

Providing the tours and the brochures as required under the Contract demanded substantial advance preparation by both parties. It had been the practice of Travellers and TWA to hold an annual planning meeting early each year to discuss the number and content of the Tours to be offered during the next calendar year, as well as the format, content, design, and number of brochures to be produced. Paragraph A.3 of the Contract provides that the final retail price for the land component of the Tours was to be agreed upon by Travellers and TWA by September 1 of the year prior to when the Tours would be offered to the public.

The prices paid by a Getaway Tour vacationer included both the cost of the Tour and the airfare to the tour destination. Travellers and TWA shared in the revenue generated by the Tours, but not the airfare, which TWA collected alone. In the past, the retail price for the land based component of a Getaway Tour was disbursed by TWA as follows: approximately fourteen percent (14%) was paid to the travel agent responsible for booking the Tour, six percent (6%) was retained by TWA as its own margin, and the balance of eighty percent (80%) was remitted to Travellers. From the percentage of the retail land tour price Travellers received, it paid the costs of operating the Tours. In addition to the 6% margin on the land-based tour aspect of the Getaway Program, TWA earned substantial revenue from the airfares it collected from Tour passengers. An internal TWA memorandum indicated that, in 1985, the Getaway Program provided incremental revenue which TWA would not have received absent its participation in the Program of over forty-nine million dollars ($49,000,000.00).

*The Dispute Between the Parties*

World events in 1985 and 1986, including the hijacking of a TWA jet, highly publicized acts of terrorism, the 1986 raid on Libya by the United States and the Chernobyl nuclear disaster, as well as the TWA flight attendants' strike, combined to reduce significantly the demand for the Getaway Tours covered by the Contract.

In late 1985, Icahn acquired control of TWA. He became Chairman of the Board of TWA in January 1986. In late 1986 or early 1987, TWA began to reexamine the economics of the Getaway Tours and the Contract. In late March or early April 1987, Craig Pavlus ("Pavlus"), a vice president of TWA, was put in charge of the Getaway Program.

In early 1986, Gerald Herrod ("Herrod"), the founder, chairman and sole owner of Travellers at the time of the Contract, sought to sell Travellers. He had been the moving force behind Travellers from its inception, although since 1980 he had begun to devote more and more time to his new venture, Ocean Cruise Lines. Herrod approached TWA and suggested that TWA

acquire Travellers.[4] Peter McHugh, a senior vice president of TWA, recommended the purchase to Morton Ehrlich, an Executive Vice President of TWA, and Icahn. According to McHugh's testimony at the preliminary injunction hearing, Icahn rejected this proposal because he was unsure if TWA should expand its involvement in the international field, in part because of the recent rise in terrorism.

Subsequently, Herrod reached an understanding with Ebsworth to purchase Travellers. Prior to consummating the purchase, Ebsworth sought and obtained TWA's written consent to the acquisition. In a letter dated August 6, 1986, McHugh, on behalf of TWA, advised Ebsworth that:

> TWA acknowledges that you are negotiating for the purchase of the business of Travellers International A.G. As long as you intend to perform according to the terms and conditions of our existing contracts with Travellers International, TWA agrees to your purchase of the business.
>
> We are looking forward to working with you in the future.

Windsor and Ebsworth purchased the assets of Travellers from Herrod, including the Contract, on August 15, 1986 and the purchase of Travellers closed on August 31, 1986.

Herrod's sale of Travellers and subsequent development of his Ocean Cruise Lines business prompted the departure of certain Travellers' employees. Herrod left Travellers after the completion of the sale to Ebsworth, although he did agree to remain available to provide consulting services. In addition, Robert Iversen ("Iversen"), the President and Chief Operations Officer of Travellers, left Travellers in April or June 1986, months before the sale to Ebsworth. David Yellow ("Yellow"), the Director of Product Development, and Debbie Natansohn ("Natansohn"), the Creative Director, each left Travellers in or about August 1986. All of these individuals had participated in the annual planning meetings with TWA. In the year preceding the sale to Ebsworth, however, Herrod, Yellow and Natansohn had all begun to devote much of their time to Herrod's Ocean Cruise Line business.

TWA had knowledge that each of these employees was leaving Travellers prior to the close of Ebsworth's purchase of the business. In fact, TWA even recommended that Ebsworth hire Malcolm Speed ("Speed"), a former TWA executive, to replace Iversen.

While Herrod's departure resulted in some change in the complexion of Travellers' staff, the great bulk of employees stayed on after Ebsworth took control. Twenty key management positions at Travellers relating to the operation of the Tours remained filled by the same employees who had occupied these position under Herrod for over a year after the sale to Ebsworth. These individuals all had substantial experience with Travellers and held key positions

---

**4.** Herrod sent a letter to TWA, dated April 1, 1986, in support of his suggestion that TWA purchase Travellers. He explained that he was giving priority to selling Travellers either to TWA or another company, instead of retaining control of Travellers himself due to "personal reasons (I am 60 next year and already overworked running a cruise line)." In this letter, Herrod described Travellers as follows:

> Essentially, Travellers encompasses a group of about 15 affiliated companies in various countries in Europe and in the United States. The main company was founded in 1963. Head office is in Basel, Switzerland. Principal business is tour operating and design and production of tour brochures and collateral materials. Offices are maintained in New York, London (3), Athens, Rome, Madrid, Torremolinos, Venice, Dublin, Manchester plus "joint venture" offices in Paris, Copenhagen, Cairo, and Tel Aviv. We have approximately 250 full time employees and 500 part time. Travellers is privately owned, has no outstanding loans, and more details of the company structure would of course be provided if there was serious interest.
>
> Principal source of business is TWA Getaway, SAS Viking Vacations, Cunard Line plus Travellers own charter and special group business. Total sales in 1985 exceeded $150 million. The company is recognised [sic] as No. 1 for Americans in Europe both for quality and size. Travellers enjoys an unusual credit standing with suppliers negating the need for advance payments thereby creating substantial profit on cash flow. Quality of middle and top management is excellent. The group has shown steadily advancing profits since the first year of incorporation.

in supervising the operation of the Tours, planning the Tours, determining the prices for the Tours, handling the finances for the Tours, or dealing directly with the needs and complaints of the Tour passengers.

After Ebsworth completed the purchase from Herrod, Travellers, as owned by Windsor and Ebsworth, began performing under the Contract. Travellers concluded the Tours previously arranged for 1986 and completed the brochures for the 1987 Tours that had been approved. In the fall of 1986, Travellers utilized substantially the same management, employees, hotels and other tour service providers that had previously been used in providing the Getaway Tours. During this time, TWA expressed a desire to work with Ebsworth and his staff in a number of letters sent to Travellers.

Unfortunately, the change in control of the two companies foreshadowed a change in the harmonious relationship the two companies had enjoyed for over a decade. The spring and summer of 1987 saw a series of confrontational meetings between representatives of Travellers and TWA escalate into a battle between Ebsworth and Icahn, culminating in a heated exchange between the two men at a dinner meeting on August 5, 1987. For a specific recounting of the details of these meetings, including the accusations hurled by each party at the other and the positions taken with respect to continued performance under the Contract, the reader is referred to Judge Sweet's opinion, *Travellers International AG v. Trans World Airlines, supra*, 684 F.Supp. at 1213–14. Suffice it to say that TWA, believing the Contract unduly benefitted Travellers at its expense, sought to alter certain of the past practices between the parties.

Accordingly, in May 1987, TWA successfully renegotiated a reduction in the price paid to Travellers under the Contract for preparing the 1988 brochures, and reduced the number of brochures to be produced by Travellers. In June 1987, TWA proposed to increase its margin for the land-based tour. After stormy negotiations throughout the summer, TWA's margin was increased from six percent (6%) to ten percent (10%) of the retail land tour price.

Furthermore, in August 1987, Icahn had a change of heart regarding the propriety of TWA expanding into the international tour business. He offered to purchase Travellers from Ebsworth for the same price Ebsworth had paid a year earlier. When this offer was rejected by Ebsworth as inequitable, TWA began looking into developing its own in-house tour capacity. At the end of August, 1987, Icahn, Ehrlich and Pavlus met with representatives of Abercrombie & Kent International, Inc., a tour operator located in Illinois, to discuss the prospect of hiring that firm to provide the Getaway Tours. Geoffrey Kent ("Kent"), Chairman of the Board of A & K Group of Companies, summarized the discussion in a letter dated September 1, 1987, which he sent to Ehrlich, copied to Icahn and Pavlus. The Getaway Program was described as very successful, and it was noted that:

(e) Travellers get[s] well compensated for [its work under the Contract], to the detriment of TWA, who in fact could do this "in-house" and so eliminate a 'middle man' and enhance identity throughout the trade. . . .

(f) If Travellers was eliminated, TWA would have more control of their clients and it would maximise [sic] profits as they would receive all returns.

(g) TWA has a problem in that they do not have the necessary inhouse expertise to replace Travellers, both in the selection and creating of tour product, and the operation of the actual holidays.

In early September 1987, Icahn, Ehrlich and Pavlus again met with Abercrombie & Kent officials. Kent sent a letter to Ehrlich, dated September 12, 1987 and copied to Icahn and Pavlus, which summarized this meeting and stated that:

We unanimously agreed that the situation with Travellers had first to be cleared up and decided upon before we could go forward.

.     .     .     .     .

TWA would contact Travellers and arrive at a decision for the future, at which time they would call A & K.

## The Termination

On September 16, 1987, Pavlus sent Travellers a letter purporting to terminate the Contract. The letter, which was also copied to both Ehrlich and Icahn, stated that the termination would be "effective December 31, 1988 with respect to Tours and as of December 31, 1987 with respect to Tour Brochures" and set forth six grounds justifying the termination.[5] At trial, however, TWA relied only upon the following grounds referred to in the letter:

(1) The departure of a substantial portion of the key management team of Travellers and its related companies in violation of paragraph F(1)(vi) and,

(2) the operation by Travellers of the SAS Viking Vacation program to Scandinavia in violation of paragraph D.1.

TWA asserted in the letter that Travellers had failed to produce brochures of the same quality as those produced during the 1979 Agreements and had failed to indemnify TWA as provided for in the Contract. No meaningful evidence was produced by TWA concerning these grounds at either hearing. In fact, the evidence adduced concerning the brochures demonstrated that they continued to be praised by TWA and travel agents during 1987. TWA no longer argues that these proffered reasons for the termination apply.

At trial, TWA asserted three additional justifications for its termination that had not been included in the original termination letter. These new allegations were that Travellers had breached the Contract because:

(1) Travellers had not complied with the competitive pricing clause contained in Paragraph A.4;

(2) Travellers operation of land tour programs for Cunard was a violation of paragraph D.1; and

(3) Travellers violated the implied covenant of good faith and fair dealing by virtue of its failure to share the currency exchange profits with TWA.

After the termination, TWA and Travellers resumed talks concerning the sale of the company, but no agreement was reached and this litigation commenced. In or about December 1987, TWA issued a document entitled "1988 Business and Marketing Plan" which represented a proposal for the creation of a new company called

---

**5.** The letter read as follows:

The causes for termination are:

1. The departure of a substantial portion of the key management team of TI and its related companies as provided in paragraph F(1)(vi);

2. Failure of the Tour Brochures to have a marketing impact on potential customers for the Tours which is at least equal to the marketing impact of the Getaway USA to Europe Tour Brochures produced from 1980–1984 as provided in paragraph F(1)(iv);

3. Operation by TI and/or its affiliates of land/sea arrangements of tours other than for TWA and the provision to a third party of consulting or other services relating to the operating, wholesaling, and promotion of tours in violation of the provisions of paragraph D(1) and therefore paragraph F(1)(iii). We refer specifically to your activities in conjunction with SAS.

4. Your provision of TWA's artwork, graphics, slogans, trademarks, service marks, and creative concepts to SAS in connection with its tour operations in violation of the provisions of paragraph D(2) and therefore paragraph F(1)(iii);

5. Violation of TI's undertaking to maximize the identity of the Tours with TWA in the minds of both the tour passengers and the suppliers of hotel accommodations and other elements of the land arrangements, specifically by copying the concept and the style of the Tour Brochures in promotional material designed for SAS in violation of the provisions of A(2)(ii) and therfore [sic] paragraph F(1)(iii).

6. Failure to indemnify TWA from and against all liabilities damages, penalties, claims, actions and proceedings arising out of the land arrangement or arising out of TI's activities in connection with the functions and services provided by TI under the agreement in violation of paragraph A(1)(iii) and therefore paragraph F(1)(iii). Moreover, such failure has resulted in serious damage to TWA's reputation with default judgments having been entered against TWA in at least the states of New York, New Jersey, California and Ohio because of TI's willful failure to satisfy its indemnification obligations.

"The Getaway Group." The Getaway Group was intended, among other things, to develop and operate the Getaway Tours in conjunction with TWA. A corporation was created for this purpose in early December 1987. TWA advertised for travel executives to join the Getaway Group, and specifically solicited certain employees of Travellers to assume management positions in the new company.

On December 7, 1987, Pavlus sent a telex to approximately one hundred eighty, (180) hotels and tour service providers in Europe that were under contract with Travellers to provide services for the 1988 Getaway Tours. The telex advised the tour service providers that Travellers had breached the Contract with TWA and would not be operating the Getaway Tours. As a result, Travellers' relationships with these service providers was disrupted. After the preliminary injunction was issued, TWA sent out another telex, informing the tour service providers that Travellers would still be performing under the Contract.

Due to the termination and ensuing litigation, Travellers and TWA did not have the annual planning meeting for the 1989 Tours until May 1988, after the preliminary injunction was in place. The conflicting telexes and the late start in planning the Tours created difficulties for Travellers in contracting with hotels and tour service providers. In addition, at TWA's insistence, the number of brochures produced by Travellers for the 1989 tour season was reduced from eleven to four. Despite other disputes in the spring and summer of 1988 concerning tour itineraries, brochure content, and marketing strategies, the substance of the 1989 Tours was agreed upon and the brochures for the 1989 Tours were completed.

*Travellers' Dealings with SAS and Cunard*

Section D of the Contract set forth the exclusivity provisions with respect to the Tours and brochures. TWA agreed to use Travellers exclusively to provide the tours and create and produce the brochures for "all of TWA's proprietary United States to Europe, Israel, or Egypt tours (except Fly/Drive tours and nongroup tours)." Travellers, in turn, agreed not to provide or operate tours which would compete with the Getaway Tours without TWA's consent.

Beginning in 1975, Travellers operated tours in Scandinavia using Scandinavian Airline System ("SAS") as the airline to transport passengers from the United States. Travellers relationship with SAS had been open and well known to TWA for a number of years prior to the termination. Herrod specifically referred to Travellers' relationship with SAS in his April 1, 1987 letter to TWA offering to sell the company, and advertisements for Travellers' Viking Vacation tours readily disclosed the participation of SAS.

While TWA had been providing Getaway Tours to Scandinavia for many years, until 1985 TWA had no transatlantic flights from the United States to Scandinavia. In 1985, TWA began to offer a flight from the United States to Copenhagen, with a stop in London. In May 1987, TWA commenced non-stop flights from New York to Scandinavia.

Travellers was advised of this planned expansion in TWA's service to Scandinavia at the March 1987 planning meetings. Nevertheless, on or about July 25, 1987, Travellers renewed its contract with SAS concerning the Viking Vacation tours. In late August 1987, TWA specifically inquired into Travellers' dealings with SAS and was informed of the renewal of the Viking Vacation tour contract. On September 1, 1987, Icahn informed Speed that he considered Travellers' business with SAS to constitute a breach of the Contract. In response, the next day Travellers terminated its contract with SAS. Travellers confirmed the cancellation of the SAS contract by letter dated September 11, 1987.

In addition to its contractual relationships with TWA and SAS, Travellers has been providing tours for the Cunard Steamship Company ("Cunard") since 1971–72. TWA knew of this relationship, which was also referred to in Herrod's April 1, 1987 letter to TWA and openly advertised in the trade press. The Cunard vacation package

includes a one-way trip across the Atlantic Ocean on the Queen Elizabeth II cruise ship and a complimentary return trip on British Airways. Passengers also have the option of purchasing a return flight on the Concorde jetliner or a return voyage on the Queen Elizabeth II. The Cunard vacation package is approximately three times more expensive than a Getaway Tour vacation.

Travellers also provides tours for Ocean Cruise Lines, and has an agreement to provide tours during the 1989 season in conjunction with Sitmar Cruise Lines. Finally, Travellers has its own charter tour group business and a motor coach company. Despite these additional activities, approximately 90–95% of Travellers' business consists of the Contract with TWA.

Judge Sweet found that Travellers had one hundred ninety-four (194) employees at the end of February 1988. The evidence presented at trial indicated that one side effect of the dispute over the Contract was a slight reduction in the size of Travellers' staff, to approximately one hundred sixty (160) employees.

After the termination letter was issued by TWA, Travellers inquired into the possibility of entering into tour operation arrangements with other air carriers, including American Airlines. These talks, however, did not prove fruitful. Travellers has not been able to find any other business to replace the Getaway Program. It currently has no prospective business other than that mentioned above, and the lead time necessary to establish prospective tour business presents a substantial obstacle to finding an alternative to its dealings with TWA. Without the continued enforcement of the Contract, Travellers will not be able to remain in business.

## DISCUSSION

■ Permanent injunctive relief is appropriate if (1) plaintiffs are successful on the merits of their claim, (2) there is no available remedy at law and (3) the balance of equities favors granting such relief. *See New York State National Organization for Women v. Randall Terry*, 704 F.Supp. 1247, 1262 (S.D.N.Y.1989), *aff'd as mod-*

*ified*, 886 F.2d 1339, 1362 (2d Cir.1989). Irreparable harm is one basis for showing the inadequacy of any legal remedy. *Id.* at 1262, n. 20; *See also Buckingham Corp. v. Karp*, 762 F.2d 257, 262 (2d Cir.1985).

■ Initially, the Court addresses the motivation behind TWA's termination of the Contract on September 16, 1987. The evidence and argument presented at the preliminary injunction hearing led Judge Sweet to comment that:

In an exercise of candor and reality, TWA has urged, appropriately, that the driving force for the termination was the economic effect of the Contract as perceived by Icahn,.... Regrettably for TWA, however, even assuming the effect was as believed by Icahn, Travellers' profit does not provide a ground for contract termination.

*Travellers International AG v. Trans World Airlines, supra*, 684 F.Supp. at 1217. This Court agrees. TWA's motivation for terminating the Contract was economic—Icahn believed TWA could benefit financially by ending its contractual relationship with Travellers. TWA's inclusion of grounds for termination which had no reasonable basis in fact, as well as the circumstances surrounding the issuance of the termination letter, including Icahn's rebuffed attempt to purchase Travellers and TWA's preliminary meetings with Abercrombie and Kent concerning their provision of the Getaway Tours in place of Travellers, lead the Court to conclude that the reasons TWA advanced for terminating the Contract were indeed pretextual. The true reason for TWA's termination centered on Icahn's desire to obtain some of the benefits which Travellers enjoyed under the Contract. TWA's motivation behind the termination, however, does not end the matter. The propriety of awarding injunctive relief will depend on the sufficiency of Travellers' performance under the Contract. *See United States v. Bedford Associates*, 618 F.2d 904, 919 (2d Cir.1980); *Marisa Christina, Inc. v. Freis*, 646 F.Supp. 252, 254 (S.D.N.Y.1986). Accordingly, the Court turns to examine TWA's

numerous arguments that Travellers breached the Contract.

## A. The "Key Management Team" Clause

Paragraph F of the Contract, entitled "Termination," provides, in pertinent part, that:

1. This Agreement may be terminated by TWA in whole or in part (as to the Tours alone or Tour Brochures alone) at any time during the term hereof upon written notice to TI as hereinafter provided, ... (vi) if during any consecutive twelve month period, a substantial portion of the then key management team of TI and its related companies involved in activities related to the performance of this Agreement leaves or is otherwise no longer available to plan and supervise such activities.

Judge Sweet found that at the time TWA sought to terminate the Contract, twenty of the twenty-three members of Travellers' key management team remained from when Ebsworth completed his purchase of the business. *Travellers International AG v. Trans World Airlines, supra,* 684 F.Supp. at 1212, 1215. Judge Sweet concluded, however, that:

substantial issues have been presented by the key personnel provision. Whether the employees [cited by TWA] were key (there's a substantial basis for concluding they were not), and whether the Contract language "related to the performance of the agreement" modified "the key management team" or "of TI and its related companies" are substantial issues. Absent the clarity which might have been shed by punctuation, it appears that the clause modifies both "team" and "companies" and thereby restricts the number of employees involved. Two additional, substantial and

related issues remain with respect to TWA's invocation of the key personnel issue: whether or not the departure of the personnel in question was acknowledged and waived by TWA in 1986 and in early 1987, and whether or not the invocation of the key management provision was invoked pretextually on September 16, 1987.

*Id.* at 1217.

Both parties agree with the conclusion intimated by Judge Sweet that the Contract language "related to the performance of this Agreement" modifies both "the key management team" and "of TI and its related companies." A literal reading of the Contract leads the Court to the same result. The gravamen of the argument regarding this clause surrounds the proper composition of "a substantial portion of the then key management team" of Travellers.

TWA disagrees with Judge Sweet's finding that the key management of Travellers included over twenty individuals. *See Id.* at 1212, 1215. Instead, TWA argues that the key management clause referred only to certain of those individuals at Travellers who had regularly attended the annual planning meetings with TWA. TWA also asserts that the relevant time frame of the clause is any twelve month period, not just the twelve months preceding the termination. TWA contends that, as of April 1986, the key management team of Travellers included Herrod, Iversen, Yellow, Natansohn and Alex McNelly ("McNelly"), the current President of Travellers. TWA insists that because all of these employees except McNelly left Travellers by the end of August 1986, it was entitled to invoke the key management team clause as a basis for termination.[6]

---

**6.** TWA has vacillated on the issue of who it claims constituted the "substantial portion of the key management team" no longer available to work on the Contract. Initially, TWA listed Yellow, Natansohn, Iversen and Dolf Dettling as the key management that had left Travellers thereby providing a basis for termination. Once the case was transferred to this Court, TWA added Herrod to this group. TWA added five new individuals in the hearing before Judge Sweet: Sydney Lipton, Werner Schafroth, John Casulli, John Jones, and Michael Jones. In its proposed findings of facts submitted to the Court prior to trial, TWA reduced the alleged relevant key management departures to Iversen, Yellow, Natansohn, Dettling, and Casulli. Finally, in its post-trial submission, TWA focused only upon Herrod, Iversen, Yellow and Natansohn. The numerous changes in TWA's position provide telling further support for the Court's finding that the grounds advanced for the termination were pretextual.

Significantly, TWA had knowledge that each of these employees was leaving Travellers prior to the close of Ebsworth's purchase of the business. Nonetheless, TWA approved the purchase and continued to communicate to Ebsworth that it looked forward to working with him and his staff. While the approval was conditioned on continued performance according to the terms of the Contract, no additional departures of Travellers' key management team are singled out by TWA in its final post-trial submissions in support of its argument that the key management provision was violated.

The general principle of equitable estoppel prevents one party from enforcing rights which would result in a fraud or injustice upon a second party who, in justifiable reliance upon the former parties' words or conduct, had been misled into acting upon the belief that such enforcement would not be sought. *Nassau Trust Co. v. Montrose Concrete Products Corp.*, 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 667, 436 N.E.2d 1265, 1269 (1982). TWA will be equitably estopped from asserting the key management team clause as a basis for terminating the Contract if the following conditions are met: (1) TWA knew the facts concerning the departure of these employees; (2) TWA intended that its conduct be acted upon or acted in such a manner that Travellers had a right to believe it so intended; (3) Travellers was ignorant of the true facts; and (4) Travellers relied on TWA's conduct to its injury. *See Rosenthal v. National Life Ins. Co.*, 486 F.Supp. 1018, 1023 (S.D.N.Y.1980).

TWA was well aware Iversen had left and Herrod would be leaving Travellers even before Ebsworth approached it regarding his planned purchase of the company, and TWA knew Yellow and Natansohn were leaving Travellers at about the time it approved the sale to Ebsworth. TWA's approval of the sale was clearly intended to cause Ebsworth and Windsor to act in reliance and consummate the purchase of Travellers. The approval also precipitated the departure of Herrod, Yellow and Natansohn from Travellers to work for Ocean Cruise Lines. Plaintiffs had no knowledge, and could not reasonably be expected to know, that TWA, while approving the sale and welcoming Ebsworth to the Getaway Program, was reserving to itself the ability to terminate the Contract whenever it wished because the sale had resulted in the departure of certain employees. Finally, Ebsworth and Windsor relied on TWA's representations that the sale was approved and that they would continue to work together under the Contract by purchasing Travellers from Herrod for consideration that included enforceable rights under the Contract. Therefore, TWA is equitable estopped from asserting the departure of these individuals as grounds for termination of the Contract.

Furthermore, TWA waived whatever rights it might have had concerning the departure of these individuals by approving the sale. Waiver is the intentional relinquishment of a known right. *Gilbert Frank Corp. v. Fed. Ins. Co.*, 70 N.Y.2d 966, 968, 525 N.Y.S.2d 793, 795, 520 N.E.2d 512, 514 (1988). Waiver, unlike equitable estoppel, does not require a showing of detriment by a party claiming to have been misled. *Nassau Trust Co. v. Montrose, supra*, 56 N.Y.2d at 184, 451 N.Y.S.2d at 668, 436 N.E.2d at 1270. While the Contract contains a no-waiver provision in paragraph G.2, New York law allows the parties to waive such a no-waiver provision by a subsequent course of conduct. *See Christian Dior–New York, Inc. v. Koret, Inc.*, 792 F.2d 34, 39–40 (2d Cir.1986); *Seven–Up Bottling Co. (Bangkok), Ltd. v. Pepsico, Inc.*, 686 F.Supp. 1015, 1022–23 (S.D.N.Y.1988). TWA's approval of the sale with knowledge of certain specific changes in personnel constituted a waiver of its right to invoke the key management team clause as applied to those same employees. The waiver of this basis for terminating the Contract is especially clear here, as TWA accepted the benefits under the Contract for over a year after it approved of Ebsworth's purchase and the employees at issue had left Travellers. *See Lee v. Wright*, 108 A.D.2d 678, 680, 485 N.Y.S.2d 543, 544 (1st Dep't 1985); *Webster's Red Seal Publications, Inc. v. Gil-*

*berton World–Wide Publications, Inc.*, 67 A.D.2d 339, 341–42, 415 N.Y.S.2d 229, 231–32 (1979), *aff'd*, 53 N.Y.2d 643, 438 N.Y. S.2d 998, 421 N.E.2d 118 (1981).

Moreover, there has been no evidence presented by TWA that a substantial portion of the key management team actually did leave in a twelve month period. Herrod, Yellow and Natansohn had significantly reduced the time they worked on the Getaway Tours prior to the sale to Ebsworth in order to focus their energy on Herrod's new venture, Ocean Cruise Lines. Both Yellow and Natansohn spent over half of their time on Ocean Cruise Line matters. In addition, it is unclear that Natansohn, who largely performed the duties of a copy writer for the brochures, was part of Travellers' key management team at all.

Travellers, on the other hand, produced largely uncontroverted evidence that at the time of TWA's termination its key management team included an additional twenty individuals who remained in the management positions they had occupied since before Ebsworth assumed control of the company. Indeed, the employees cited by Travellers as being part of its key management team all had substantial years of experience with the company, and held important financial, supervisory, administrative, or practical positions necessary for the performance of the Contract. Even adopting TWA's twelve month period as beginning in April 1986 with the departure of Iversen, TWA has still failed to demonstrate that a substantial portion of the key management team of Travellers left or was unavailable to plan and supervise the Getaway Tours.

TWA's assertion that the key management clause should be limited to only certain individuals who participated in the planning meeting is unfounded. The key management provision specifically refers to the performance of the Contract, not attendance at the annual planning meetings. Attendance at the planning meeting was just one facet of the overall planning necessary for the Tours, and was unrelated to the many other supervisory tasks necessary for the "performance" of the Contract. TWA has offered no support for reading the clause in this limited manner.

TWA, relying largely on the testimony of Suzanne Clarke ("Clarke"), an in-house attorney for TWA who had been involved in drafting the Contract, next argues that even a change in the key management of Travellers as small as the departure of one key individual would provide a basis for termination under the clause.

The 1974 Agreements had contained a clause which allowed TWA to end its relationship with Travellers if Herrod no longer exercised overall supervision of the activities of Travellers under the Agreements. This clause was deleted from the 1979 Tour Agreement and replaced by a key management team clause similar to that in the Contract. Travellers and TWA retained the requirement that Herrod supervise the activities of Travellers relating to the 1979 Brochure Agreement. During this time, Travellers successfully operated the Getaway Tour program, grew in size and management depth, and Herrod's involvement with the Getaway Program decreased significantly. Consequently, in 1984, all reference to Herrod was deleted in favor of the key management team clause.

TWA's proffered reading of this section of the Contract effectively eliminates the "substantial" language from the key management team clause, and is directly contradicted by the statements of Jack Burkham ("Burkham"), TWA's vice president and chief negotiator for the Contract.

Prior to entering into the Contract, Burkham, in an internal memorandum dated November 4, 1984, recommended to TWA's top management that they approve the Contract. Burkham explained that:

> Travellers is a substantially larger company with some management depth, [and therefore] we have agreed to remove the clause which permits TWA to cancel should Jerry [sic] Herrod not be personally involved in the business. The contract still retains a clause permitting us

to cancel should Travellers have a large amount of key management turnover in a short period of time.

Burkham testified at his deposition that the term "key management team" was intended to include several supervisory employees in each of a number of different positions which involved various aspects of providing the Getaway Tours. These positions included brochure development, tour negotiation, logistical operation of the Tours, supervision of Tour staff, and accounting. He recalled that the key management team at that time, largely determined by position, not name, consisted of approximately twelve to fifteen individuals. The continued growth of Travellers implies that the key management positions may well have increased, not decreased, in number by 1986–87. No other credible basis for concluding the key management team should be limited to certain individuals who attended the planning meetings or that the departure of the employees cited constituted a substantial portion of the then key management team was presented by TWA.

The Court concludes that Travellers' key management team consisted of approximately twenty individuals at the time of the termination and that these employees had remained in their management positions for more than a twelve month period. The individuals singled out by TWA did not constitute a substantial portion of the then key management team of Travellers and its related companies involved in the performance of the Contract. Accordingly, even if TWA was not barred from asserting the departure of these individuals as a basis for terminating the Contract by the doctrines of equitable estoppel and waiver, the key management team clause would still provide no support for TWA's termination of the Contract.

**B.** *The Exclusivity Provision*

■ Paragraph D.1, which sets forth the exclusivity requirements regarding the Tours, provides that:

1. Neither TI nor any of its affiliates will, except with TWA's prior written consent (not to be unreasonably withheld) in each specific instance, directly or indirectly, (i) operate land or land/sea arrangements of any tours other than the Tours (ii) engage in the wholesaling of tours or (iii) provide to any third party any consulting or other services relating to the operating, wholesaling or promotion of tours; provided, however, that the foregoing restriction shall not apply (aa) in the case of tours that do not involve the United States to the Europe, Israel or Egypt tour market, nor (bb) with respect to tours which would not substantially compete with any of the Tours or any of TWA's proprietary tours, nor (cc) with respect to any charter tour program operated by TI or any of TI's affiliate companies for which TWA either provides the transatlantic charter air transportation or has declined to provide the same at charter prices competitive with those of other air carriers, nor (dd) with respect to the operation of air tours to be marketed by TI to persons residing in a regional area of the U.S.A. where TWA does not offer non-stop transatlantic service, which are scheduled to depart from the same region between April 1 and October 31 of each year, and which include transatlantic non-stop air transportation from the same region on a specific other scheduled carrier.[7]

Subsection (dd) of the above clause makes it clear that Travellers' dealings with SAS, about which TWA knew and had never objected, were perfectly legitimate under the Contract prior to TWA's commencement of non-stop flights from the United

---

**7.** Paragraph D.2 contains an exclusivity provision relating to the Tour brochures which states that:

Neither TI nor any of its affiliates will, except with TWA's prior written consent (not to be unreasonably withheld) in each specific instance, directly or indirectly (i) create or produce any tour brochures other than for TWA or (ii) perform any market research, marketing consulting, advertising or promotional services for tours, tour programs or tour brochures other than for TWA provided, however, that the foregoing restrictions shall not apply in the case of tours described in clauses (aa) through (dd) of Paragraph D.1.

States to Scandinavia.[8] TWA continues to argue, however, that Travellers' relationship with SAS in the summer of 1987 provides a basis for termination.

A breach of the exclusivity provision by Travellers allows TWA to terminate the Contract pursuant to the catch-all termination provision contained in Paragraph F.1(iii). That clause states, in pertinent part, that:

> This Agreement may be terminated by TWA in whole or in part [if] ... (iii) ... TI fails to perform any of its other obligations hereunder and does not cure said failure within 30 days after written notice thereof from TWA....

TWA failed to provide written notice of Travellers' alleged breach of the exclusivity provision and failed to afford Travellers the required thirty day notice to cure any such breach prior to sending the termination letter. Despite these omissions, Travellers ended its relationship with SAS the day after being informally advised by Icahn that TWA considered that relationship a violation of the Contract. As Judge Sweet concluded, this action effectively cured whatever breach might have otherwise occurred. *See Travellers International AG v. Trans World Airlines, supra,* 684 F.Supp. at 1216–1217. Accordingly, Travellers' involvement with the Viking Vacation tours did not provide grounds for terminating the Contract.

TWA next challenges Travellers' business dealings with Cunard.[9] Travellers' relationship with Cunard, however, does not implicate the exclusivity provision of the Contract because these tours, which are different in substance and significantly more expensive than the Getaway Tours, do not substantially compete with the Tours. Therefore, the Court concludes the tours Travellers conducts for Cunard also provide no ground for termination of the Contract.

## C. The Competitive Pricing Clause

Paragraph A.4 of the Contract provides as follows:

> TI agrees that the prices charged TWA for the Land Arrangement packages for the Tours will be competitive with the prices other tour operators charge for land or land/sea arrangement packages similar, in terms of tour elements and quality, to the corresponding Land Arrangement packages of TI. The term "price" as used with reference to the land or land/sea arrangement packages of other operators shall mean, in the case of an operator who does not wholesale, the price charged by such operator to an independent wholesaler and, in the case of an operator who does wholesale, the amount collected by retail agents on account of the land or land/sea arrangement package, less a sum representing the customary wholesale mark-up that would have been applied to such package by an independent wholesaler.

TWA argues that the prices Travellers charged it for the Tours failed to satisfy the competitive pricing clause and therefore justified TWA's termination of the Contract pursuant to paragraph F(1)(iii). Travellers responds that the prices charged TWA were competitive and fully satisfied the pricing clause.[10]

---

8. TWA does not argue that the SAS tours constituted a breach of the Contract prior to the summer of 1987. To the contrary, TWA seeks to defend its failure to object to Travellers' involvement with SAS before September 1987, on the grounds that "TWA had no reason to object to the arrangement until 1987, because TWA did not fly directly from New York to Scandinavia in competition with SAS until that year." TWA's Proposed Findings of Fact and Conclusion of Law, filed on February 21, 1989, at 23–24; TWA's Post–Trial Submission, filed on April 19, 1989, at 50 ("until [the SAS [tours] were substantially competing with TWA Getaway Tours to Scandinavia, TWA would have no basis to complain").

9. TWA had asserted at trial that Travellers' relationships with Ocean Cruise Lines and Sitmar Cruise Lines also violated the exclusivity provision of the Contract. After the evidence presented provided no support for these accusations, TWA abandoned them.

10. Travellers also argues that TWA is estopped from asserting grounds for termination at trial that it failed to assert at the time of termination. *See Hydrocarbon Trading and Transport Co., Inc. v. Exxon Corp.,* 570 F.Supp. 1177, 1185 (S.D.N.Y.1983); *Holt Marine Terminal, Inc. v. United States Lines,* 472 F.Supp. 487, 489 (S.D.N.Y.1978). TWA, however, claims that it only

The language of the pricing clause, drafted by TWA, first appeared in the 1974 Agreements. The clause was reprinted, *in haec verba,* in all subsequent agreements. Travellers had been pricing the tours to TWA in the same manner since the 1974 Agreements. TWA accepted the pricing practice of Travellers throughout the many years of their relationship, and further ratified this practice by periodically entering into new agreements which contained the identical pricing provision. Prior to raising the pricing clause in this litigation, TWA had never complained to Travellers about its pricing practices. In fact, a 1979 memorandum by senior management of TWA stated that Travellers' prices were a particularly attractive feature of the relationship for TWA, and urged the Board of Directors to adopt the 1979 Agreements because contracting with a tour operator other than Travellers would not be to TWA's benefit.

■ Nonetheless, TWA now charges that Travellers never complied with the competitive pricing clause during its course of dealings with TWA. TWA maintains that for Travellers to have met its obligations under the Contract, it had to have known the wholesale prices or the customary wholesale markup charged by other tour operators.

■ The financial information regarding the price structure of the Tours is kept tightly guarded by Travellers. This shroud of secrecy also envelops the financial information of Travellers' competitors in the tour operating business. Accordingly, there is a dearth of public information on the wholesale prices charged by competing tour operators.[11] Travellers does not know, and cannot reasonably be expected to uncover, the margin retained by its competitors in the tour business or the prices they actually charge a wholesaler like TWA. Because of the industry practice of confidentiality concerning wholesale pricing, neither party has ever been able to directly determine the "price" of the Tours as defined in paragraph A.4. Despite TWA's urging, however, this fact does not necessarily render the Contract void due to uncertainty, nor result in a finding that Travellers breached its contractual duties.

■ Absolute certainty in a contractual provision is not required as long as the intent of the parties can be determined to a reasonable degree of certainty. *Lee v. Joseph E. Seagram & Sons, Inc.*, 413 F.Supp. 693, 698 (S.D.N.Y.1976), *aff'd,* 552 F.2d 447 (2d Cir.1977). Generally, in attempting to construe the contracting parties' intent fairly and reasonably, the Court must consider, among other things, the specific language of the contract, and the context within which that contract was formed. *Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir.1989). In construing the meaning the parties attached to the competitive pricing clause, the Court is guided by the long course of dealing between the parties.

> The practical interpretation of a contract by the parties, manifested by their conduct subsequent to the formation for any considerable length of time before it becomes a subject of controversy, is entitled to great, if not controlling weight in the construction of the contract.

*Vaicom International, Inc. v. Lorimar Productions, Inc.*, 486 F.Supp. 95, 98, n. 3 (S.D.N.Y.1980). The past performance of Travellers and TWA under the Contract and the previous agreements which incorporated the identical competitive pricing clause supply more than adequate context for the Court to determine the meaning the parties intended to ascribe to this clause given the inability to discover wholesale prices of other tour operators. *See Webster's Red Seal Publications, Inc. v. Gil-*

---

discovered the facts underlying the arguments it now puts forth regarding the competitive pricing clause and the currency sharing arrangement after the commencement of the lawsuit. Because the Court concludes that TWA's arguments on the merits of these issues must fail, the Court finds it unnecessary to decide if TWA's reasons for delay are sufficient to allow it to assert these after-the-fact justifications for the termination.

**11.** Both parties recognize the norm of confidentiality concerning financial information in this industry and have entered into a protective order to ensure that this material is not disclosed.

*berton World–Wide Publications, Inc., supra,* 67 A.D. at 342, 415 N.Y.S.2d at 230.

Travellers and TWA knew the competitive retail prices charged by other tour operators and the margin afforded TWA from Travellers' retail price. Travellers and its competitors were in the same market for hotels and other tour services and Travellers obtained competitive prices for these services. Throughout the course of dealing between the parties, Travellers had supplied TWA with prices for the Tours which maintained TWA's customary margin, including the margin paid to travel agents, and also provided retail prices to consumers that were competitive with other tours. Ronald Carlile ("Carlile"), the tour costing manager of Travellers, was involved in pricing the Tours to TWA beginning in 1975, and has been the individual primarily responsible for pricing the Tours since 1981. He explained that the prices Travellers charged were largely determined by the costs of providing the Tours, although the ultimate price was established by a myriad of considerations, including the ratio of cost to price from the previous year's tours and Travellers' assessment of the market for the particular tour at different price levels.

Travellers' pricing practices were not altered when Ebsworth purchased the Company. In fact, Carlile and McNelly each testified that the average margin Travellers retained from the Getaway Tours actually declined from its pre–1985 level to the present.

In addition, while the exclusivity provisions of the Contract limited Travellers' ability to supply tours to other wholesalers or retailers, Travellers did know the average margins it retained in its dealings with SAS, Cunard and Sitmar. The evidence indicated that the average margin for Travellers on the Getaway Tours, far from being excessive, was highly competitive with the average margins Travellers obtained from its other tour operations.

TWA, on the other hand, acted as an independent wholesaler in the tour market and knew the margin it retained in its dealings with other tour operators. TWA, however, offered no meaningful proof that Travellers' wholesale prices for the Tours were higher than its competitors.[12]

Clarke, TWA's principal witness on this matter, stated that the pricing clause was not altered from the previous agreements in drafting the Contract specifically because the relationship with Travellers was working well. By incorporating the pricing clause in the Contract, the parties intended to maintain the same past pricing practices that had been in effect. TWA's continued acceptance of the pricing practices without objection, and its praise of the competitive prices Travellers offered, further support the finding that it intended the past pricing practices would satisfy the competitive pricing clause. *See Lee v. Joseph E. Seagram & Sons, Inc., supra,* 413 F.Supp. at 697–98 (law of New York expresses a clear preference for a construction of a contract in favor of validity, and the prior course of dealings between the parties is one extrinsic source which can supply certainty to an otherwise uncertain clause).

While the customary wholesale prices charged by competitors were not known by either party, the past pricing practices were known, as were the margins retained by Travellers in its other tour operations. Both support a finding that Travellers continued to offer TWA competitive prices. In fact, Clarke testified that the competitive pricing clause would be satisfied if Travellers provided TWA with prices similar to what it charged other customers. Travellers fully satisfied this condition.

The Court concludes that the parties intended the competitive pricing clause to be satisfied if Travellers continued to offer prices to TWA in accordance with their longstanding course of dealings. Travellers did just that. Therefore, the competi-

---

12. TWA presented the testimony of Samanth Addanki ("Addanki"), an economist, who compared certain Getaway Tours with tours offered by other tour operators in an attempt to prove that Travellers' wholesale prices were not com-

petitive. The computations performed by Addanki were not sufficiently probative of this issue, however, because they failed to adequately incorporate the variations in quality and costs of the tours compared.

tive pricing clause does not afford TWA any right to terminate the Contract.

### D. *Sharing Currency Differentials*

TWA asserts that Travellers' conduct relating to the sharing of currency profits and losses with TWA violated the implied covenant of good faith and fair dealing. This argument was first raised by TWA at trial.

■ In every contract there is an implied covenant of good faith and fair dealing which precludes each party from engaging in conduct that will deprive the other party of the benefits of the agreement. *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir.1980). "The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." *Cross & Cross Properties, Ltd. v. Everett Allied Co., supra,* 886 F.2d at 502.

Because the Tours involved services and activities in many different countries, various currencies were utilized to pay the tour service providers. The variations in the exchange rates created the risk that the actual costs of the Tours would rise relative to the dollar, as well as the opportunity to capitalize on costs which fell relative to the dollar.

■ TWA and Travellers shared currency differentials in the past by making weekly computations based on the published exchange rates of the Swiss Bank Corporation in Switzerland the week the Tours departed. The sharing of these currency differentials, based upon the various foreign currencies relative to the dollar, was reflected in weekly invoices sent by Travellers to TWA. The tour service providers were paid by Travellers weeks later when their invoices were received. The exchange rates actually used to pay the suppliers were the exchange rates in effect at the time the payments were made, not necessarily the exchange rates contained in the invoices sent to TWA. The general method of sharing currency was known and accepted by TWA. Both parties shared the gain when the dollar rose, and shared the loss when the dollar declined.

TWA argues that during discovery it learned that Travellers would exchange large amounts of currency on days when it could obtain more favorable rates than those quoted to TWA and thus reap a windfall on the currency differential which was not shared with TWA. Despite this assertion, TWA presented no evidence that Travellers acted in a manner that was contrary to its agreement with TWA. Travellers' actions did not harm TWA or reduce the benefits TWA received under its agreement regarding currency sharing. TWA apparently feels that this agreement was not sufficiently favorable to it financially. Accordingly, TWA has altered this arrangement for the 1989 tours and will pay Travellers directly in the local currencies used on the Tours. While TWA may find the new arrangement more suitable to its economic self interest, there is simply no basis for finding a breach of the covenant of good faith and fair dealing by Travellers due to its prior currency differential activities.

TWA's termination was not justified under the Contract. Travellers had adequately met its obligations pursuant to the Contract, and had cured whatever violation may have occurred due to its dealings with SAS. Accordingly, Travellers has succeeded on the merits of the contractual claim. The Court must now determine if Travellers has demonstrated that it is entitled to a permanent injunction.

### E. *Entitlement to a Permanent Injunction*

■ Travellers seeks a permanent injunction requiring TWA to specifically perform the Contract. Specific performance of a contract is appropriate when (1) the contract is valid, (2) plaintiff has substantially performed under the contract and is willing and able to perform its remaining obligations, (3) defendant is able to perform its obligations, and (4) plaintiff has no adequate remedy at law. *Niagara Mohawk Power Corp. v. Graver Tank & Manufacturing Co.,* 470 F.Supp. 1308, 1324 (N.D.N.Y.1979); *See also Guinness Harp Corp. v. Jos. Schlitz Brewing Co.* 613 F.2d 468, 473

(2d Cir.1980) ("New York follows the general rule that specific performance is available where there is no adequate monetary remedy").

■ The evidence established that the Contract was valid and that Travellers had substantially performed its obligations. Travellers demonstrated that it will not be able to continue as a going concern at this time if the Contract, representing 90–95% of its business, is terminated. The destruction of a business has long been held to constitute the type of irreparable injury for which there is no adequate monetary remedy. *Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 125 (2d Cir.1984); *See also Baker's Aid, A Division of M. Raubvogel Co, Inc. v. Hussmann Foodservice Co.* 830 F.2d 13, 16, n. 3 (2d Cir.1987) (per curiam); *American Motor Club, Inc. v. Cocoran*, 644 F.Supp. 862, 866 (S.D.N.Y. 1986).

In addition, the balance of equities tips markedly in favor of Travellers. Termination of the Contract will put Travellers out of business, while continued performance under the Contract is likely to also continue to be profitable for TWA. Regardless of the profitability of the Tours to TWA, its dealings with Travellers represent only a small fraction of its overall business, and the continuation of the Contract in no way threatens TWA's ability to remain in business.

TWA's final argument against the imposition of a permanent injunction is that compliance with the injunction would require constant judicial intervention in the business activities of the parties. *See Niagara Mohawk Power Corp. v. Graver Tank & Manufacturing Co., supra*, 470 F.Supp. at 1326. This argument, like the many that came before it, is inapposite. While Travellers and TWA are required to work together in order to agree on pricing and the substantive content of the Tours and brochures, the long history of their relationship indicates they can do just that without constant judicial intervention. In fact, the evidence indicated that the representatives of TWA involved in actually planning the Getaway Tours have had much less trouble dealing with their counterparts at Travellers than do the leaders of the respective organizations.

While there have been certain disputes regarding continued performance under the preliminary injunction and an inordinate amount of petty complaints by both sides, the parties have been able to offer Getaway Tours to the public during 1989. A continuation of the requirement that disputes under the Contract be resolved with reference to the past practices of the parties provides more than adequate direction to enable them to operate the Getaway Tours in the future without continual judicial involvement.[13] In addition, the planning meeting for the 1990 Tours, held during the recess in the trial, was reported to have been successful, and the Court is unaware of any recent conflicts that would make continued performance under the Contract an especially onerous burden on TWA.

## CONCLUSION

Plaintiffs have demonstrated that they adequately performed their obligations under the Contract and therefore that TWA's termination was unjustified. They have also proven that they will be irreparably harmed absent TWA's continued performance under the Contract. Accordingly,

13. Plaintiffs argue that TWA has acted in bad faith in its efforts to perform the Contract as required by the preliminary injunction. They rely largely on TWA's business with other tour operators, its reduction in the number of brochures and an internal sales force target of sixty-four thousand (64,000) Getaway Tour passengers. It is worth emphasizing that the duty of good faith and fair dealing still applies to the efforts of both parties to perform the Contract and comply with the injunction. More specifically, the target figure of one hundred thousand (100,000) Tour passengers per year, provided for in paragraph A.5, implies that both parties will exercise good faith efforts to reach that desired volume of Tour passengers. The evidence adduced to this point has not sufficiently demonstrated bad faith on the part of TWA, however, TWA's future compliance with the injunction will be measured by the extent of its efforts to fulfill its contractual obligations.

plaintiffs' request for a permanent injunction preventing TWA from terminating the Contract is granted. The parties are directed to continue to perform the Contract as provided for in Judge Sweet's preliminary injunction. In view of the foregoing, the Court is of the opinion that the remaining damage claims are premature and can only be determined following the completion of the Contract. Therefore, the damage claims are dismissed without prejudice.

Settle permanent injunction and order on notice.