**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-0863-20
A-0803-21

IN THE MATTER OF THE
ESTATE OF JOSEPH
KRIVULKA, Deceased.

_____

Argued January 26, 2022 – Decided August 26, 2022

Before Judges Hoffman, Geiger and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Monmouth County, Docket No. P-000262-20, and interlocutory orders of the Superior Court of New Jersey, Chancery Division, Monmouth County, Docket No. P-000159-21.

Lita Beth Wright argued the cause for appellant Angela L. Krivulka (Amini LLC, and Rivkin Radler, LLP, attorneys; Jenna Z. Gabay, of counsel and on the briefs; Lita Beth Wright, on the briefs).

Jeffrey J. Wild argued the cause for respondent Michael J. Lerner in A-0863-20 (Lowenstein Sandler, LLP, attorneys; Jeffrey J. Wild, of counsel and on the brief; Sarah Scott, on the brief).

Ronald L. Israel argued the cause for respondent Harriet Derman in A-0863-20 (Chiesa Shahinian &

Giantomasi, PC, attorneys; Ronald L. Israel, on the brief).

Jeffrey J. Wild and Ronald L. Israel argued the cause for respondents Michael J. Lerner and Harriet Derman in A-0803-21 (Lowenstein Sandler, LLP, and Chiesa Shahinian & Giantomasi, PC, attorneys; Jeffrey J. Wild and Ronald L. Israel, on the joint brief).

Winegar, Wilhelm, Glynn & Roemersma, PC, attorneys for respondents Hannah Krivulka and Preston Krivulka in A-0803-21, join in the joint brief of respondents Michael J. Lerner and Harriet Derman.

Philip B. Vinick, attorney for respondent Erin Krivulka in A-0803-21, joins in the joint brief of respondents Michael J. Lerner and Harriet Derman.

PER CURIAM

Appellant Angela Krivulka[1] (Mrs. Krivulka), individually and as co-executor of the Estate of her late husband, Joseph Krivulka (Mr. Krivulka), appeals from the October 23, 2020 Probate Part order denying her motion to disqualify her former counsel, Lowenstein Sandler LLP (Lowenstein), from representing respondent Michael Lerner, Esq. as co-executor of the Estate. Mrs. Krivulka sought disqualification based on Lowenstein's alleged violation of Rule of Professional Conduct (RPC) 1.9(a), which prohibits a lawyer, who has

---

[1]  For ease of reference, we refer to Angela Krivulka as Mrs. Krivulka, Joseph Krivulka as Mr. Krivulka, and his estate as the Estate.

A-0863-20

represented a client in a matter, from representing another client with materially adverse interests to the former client in the same or a substantially related matter, "unless the former client gives informed consent confirmed in writing."

By leave granted, Mrs. Krivulka also appeals from September 3, 2021 Probate Part orders that removed her as co-executor, denied her motion to compel net income distributions, and denied a second motion to disqualify Lowenstein. On November 18, 2021, we consolidated both appeals.

After careful review of the record, we affirm the removal of Mrs. Krivulka as co-executor and the denial of her motion to compel net income distributions; however, we reverse the October 23, 2020 order denying Mrs. Krivulka's motion to disqualify Lowenstein from representing Lerner as co-executor of the Estate.

I.

We discern the following facts from the record. Mr. and Mrs. Krivulka married in 2005 and remained married until Mr. Krivulka's death in 2018. Mrs. Krivulka has two sons from a prior marriage. Mr. Krivulka had three children from prior relationships.

Lerner, an attorney and partner with Lowenstein, chairs the firm's Life Sciences Group. Mr. Krivulka, who served as president of multiple pharmaceutical businesses, retained Lerner and Lowenstein to handle numerous

3

complex matters for him and his companies over the years. In addition, Lowenstein served as personal counsel for Mr. and Mrs. Krivulka, in addition to counseling businesses owned and controlled by them.

In 2009, Mr. and Mrs. Krivulka retained Lowenstein to represent them, jointly, for estate planning purposes. Lowenstein proceeded to prepare their wills and related estate planning documents, including multiple trusts, powers of attorney, and advance health care directives. In Mrs. Krivulka's estate planning instruments, she named Lerner, her "attorney and friend," as a successor executor, trustee, attorney-in-fact, and health care proxy to her husband. In addition to estate planning, Lowenstein also represented Mrs. Krivulka and her children in other matters, including the acquisition of a spa/salon business.

On August 19, 2009, Mr. Krivulka executed a will, naming Mrs. Krivulka and Lerner co-executors of his Estate. Significantly, the will also empowered Lerner "to appoint any combination of one or more individuals or financial institutions to serve as co-executors along with him at any time . . . ." The will did not empower Mrs. Krivulka to appoint any co-executors.

After Mr. Krivulka died on February 17, 2018, Mrs. Krivulka and Lerner initially retained Lowenstein to represent them as co-executors of the estate. In

4

an engagement letter dated March 19, 2018, Lowenstein partner John L. Berger stated the firm would "render the legal services you require in administering the Estate. This includes advising you on legal aspects of your fiduciary responsibilities and preparing needed documents. (e.g., probate papers, federal Estate Tax Return, New Jersey Inheritance Tax Return, and documents effectuating interim and final distributions)."

The engagement letter also discussed the risks of joint representation and stated that Mrs. Krivulka and Lerner waived any conflict of interest arising from the joint representation:

> Both of you desire to have our firm represent you jointly. Based on the facts currently known to us, we believe we may represent you jointly in connection with this matter. However, the Rules of Professional Conduct provide that in a circumstance in which the representation of one client might be affected by the joint representation of that client and another client, we must obtain informed written consent to such joint representation from all of the clients after full consultation and disclosure. Joint representation may be cost-efficient as it may avoid the duplication of effort and expense likely to result if each client has a separate attorney.
>
> There are certain risks associated with the joint representation of clients. Our communications with both of you, and all information provided by both of you, shall not be privileged as to the other. Such communications and information may be shared by us with both of you, and both of you shall have the right

5

A-0863-20

to have access to such communications and other information. The attorney-client privilege does remain intact as to third parties and, thus, third parties will not have access to our communications with either of you without your consent.

In the event that a conflict of interest arises between you, we may be forced to withdraw as counsel to one or both of you. In such event, one or both of you would be required to obtain new counsel with the likely duplication of expense that arises from engaging new counsel.

Both of you, by your acceptance of this agreement, hereby waive any conflict of interest that may exist or arise by virtue of our firm's joint representation of you.

The engagement letter also included an "Advance Waiver of Conflicts on Unrelated Matters":

Please understand that our firm represents many other clients. The firm will not represent a person who is adverse to either of you in a matter that is the same or substantially related to a matter in which the firm represents you. We will also at all times honor our ethical obligation to maintain the confidentiality of information relating to our representation of you. However, some of our current or future clients may have matters, including transactional, bankruptcy or litigation matters, adverse to you. Therefore, we ask that you waive any conflict of interest arising from our representation of a person who is adverse to any or all of you in a matter not the same or substantially related to our representation of you. The attorneys working on matters for you would be screened from working on any such adverse matters. This advance waiver by you only

6

applies to conflicts of interest arising after the date of this letter, and therefore pertains to facts and circumstances not currently known. By your execution of this letter, both of you hereby waive any conflict of interest that could be asserted with respect to any adverse representation described in this paragraph.

Within two weeks of signing the engagement letter, Mrs. Krivulka wrote to Berger, expressing "great concern regarding the handling of the Estate" and conflicts of interest arising from Lerner's relationship with Lowenstein. In an email sent on April 2, 2018, Mrs. Krivulka identified some of these conflicts: Lerner "being a partner at Lowenstein and involved in many of Joe's company transactions, from contracts to personal investment or shareholding," the disposition of which would profit Lerner; "[t]he limited amount of information provided to me, as wife, co-executor and beneficiary"; Lerner failing to complete documents providing for the succession of all of Mr. Krivulka's business entities despite receiving his instruction sixty days before his death; Lerner alone deciding how to proceed with those businesses rather than appointing "an unbiased, financial expert"; Lerner alone going through Mr. Krivulka's personal items; and Lerner sharing Mr. Krivulka's "e-mails and conversations with various employees of my husband" and "disparag[ing] me and my intelligence to them." For these reasons, Mrs. Krivulka advised, "I

7

believe that it is prudent to engage the legal counsel of my own estate attorney to assure that the conflicts that I perceive to be taking place do not progress."

On June 7, 2018, Lerner sent a letter to Mrs. Krivulka's son, who managed three of Mr. Krivulka's business entities now part of the estate, stating Lowenstein "has determined that it should withdraw as counsel to" the three businesses in connection to a proposed sale, effective that date. Mrs. Krivulka was copied on the letter. In the letter, Lerner explained Lowenstein withdrew from representation in this transaction "because of my appointment as [c]o-[e]xecutor of the Estate . . . and because I also am a partner with Lowenstein and a member of Mist Partners," one of the three businesses involved in the sale.[2]

In July 2018, Mrs. Krivulka discharged Lowenstein from representing her in her capacity as co-executor and obtained new counsel. Mrs. Krivulka again sought and obtained new counsel in December 2019.

On July 24, 2020, Mrs. Krivulka filed a complaint in Arizona state court (the Arizona Lawsuit) against Lerner in his capacity as co-executor of the estate,

---

[2] The letter references "the proposed sale transaction with IBSA related to Tirosint." In Mrs. Krivulka's April 2, 2018 email raising her concerns about conflicts of interest, she specifically noted that Lerner "is very focused on the sale of Tirosint because he stands to earn a significant amount of money."

A-0863-20

seeking a declaratory judgment that "the vast majority (if not the entirety) of [the] total assets" of Mr. and Mrs. Krivulka "were community property." Mrs. Krivulka alleged that Lerner converted property that belonged to Mrs. Krivulka by managing the Estate such that her marital community property was classified as Mr. Krivulka's separate property. One week later, on July 31, 2020, Mrs. Krivulka, in both her individual capacity and capacity as co-executor of the estate, filed a separate complaint against Lerner and Lowenstein in federal court in New Jersey, alleging legal malpractice and breach of fiduciary duty. In her complaint, she alleged that Lerner and Lowenstein failed to advise her of information critical to her own estate planning and failed to complete revisions to the Mr. Krivulka's estate plan, pursuant to his instructions.

The gravamen of these two actions was Lowenstein's representation of both Mr. and Mrs. Krivulka regarding their estate planning. Mrs. Krivulka's malpractice complaint highlighted a March 8, 2016 memorandum (the March 2016 Memorandum) – with the subject line, "Estate Planning Summary" – sent to Mr. Krivulka by Berger. The email transmitting this memorandum, stated:

> Hi Joe. Attached for Angela and you is a summary of our estate planning meeting, supplemented with information regarding a possible move from New Jersey to Arizona. I'd like to discuss that issue in greater detail, as it could have a meaningful impact on

9

your planning.  Let's set a time to discuss when it is convenient for you.  Best regards, John[.]

While the attached March 2016 Memorandum was addressed to Mr. and Mrs. Krivulka, and listed Lerner and Tim Soule (an employee of Mr. Krivulka) as receiving copies, Mrs. Krivulka certified that she never saw the email or the memorandum until she discovered it after Mr. Krivulka's death.

The memorandum included the following relevant passages:

> It was a pleasure meeting Joe and Tim at our recent estate planning meeting.  I've summarized below the major issues discussed at that meeting.  As we discussed at the meeting, I also reviewed the tax laws in Arizona as it relates to both income taxes and estate taxes, and that information also is summarized below.  Of particular importance, I learned that Arizona is a so-called "community property" state; that fact could have a significant bearing on your planning, and merits further discussion.
>
> . . . .
>
> Changing Domicile: We discussed the possibility that you might move from New Jersey to Arizona.  Joe asked me to explore the tax consequences of such a move.  Arizona's top marginal income tax bracket is 4.54%, or approximately one-half of New Jersey's 8.97% top bracket.  Moreover, Arizona, unlike New Jersey, does not have an estate tax.  Thus, from a tax standpoint, Arizona clearly is a more advantageous state in which to be domiciled.
>
> One potentially complicating factor is that Arizona is a so-called "community property" state.  As

10

a general rule, community property jurisdictions treat property acquired during the marriage as being owned one-half by each spouse. This has both estate planning implications (each spouse could give away their half of the property) and non-estate planning implications (both re: control of the property during marriage and division of the property if you were to divorce). It means your current estate plan, which is designed to account for New Jersey's elective share statute, likely would need to be substantially modified. I suggest we set up a call to discuss this issue further. Once we speak, I can send you the "change of domicile" memo we discussed, if appropriate.

The March 2016 Memorandum also specifically requested for Mrs. Krivulka to address certain issues regarding advance health care directives, power of attorney, and gift tax returns. Despite Berger addressing the March 2016 Memorandum to both Mr. and Mrs. Krivulka, the record contains no evidence that Berger, nor anyone else at Lowenstein, ever sent Mrs. Krivulka the March 2016 Memorandum or discussed its contents with her. Nor did Lowenstein dispute Mrs. Krivulka's contention that she never learned of the email or the March 2016 Memorandum until after Mr. Krivulka's death.

According to Mrs. Krivulka, she and Mr. Krivulka "decided to move to Arizona and we bought our first home there in 2008. We moved into the house in 2009 and it became our primary residence." She acknowledged that "certain items such as our driver's licenses and voter registrations were not updated to

11                                                          A-0863-20

reflect the change. While Joseph was still alive, no one discussed with me the possible legal significance of this." However, she certified that "[o]ther items were changed," including, for example, Joseph's responses to a Juror Online Questionnaire from April 2017 in which he stated he was not a resident of Monmouth County, New Jersey and the reason for not serving as a juror was "NO LONGER NJ RESIDENT; home for sale. Residing in Arizona."

The following paragraphs from Mrs. Krivulka's federal court complaint provide further details of the Krivulkas' alleged move to Arizona:

> 23. At the time of their marriage, the Krivulkas were New Jersey citizens. In 2006, they moved into a home in Holmdel, New Jersey that was titled in Mrs. Krivulka's name only.
>
> 24. In March 2008, the Krivulkas purchased their first home in Arizona, and took title as community property with rights of survivorship with the intention of making it their permanent home and domicile.
>
> 25. In April 2008, Mr. Krivulka opened bank accounts at JP Morgan Chase's Carefree, Arizona branch. Mr. Krivulka also established investment accounts with Morgan Stanley in Scottsdale, Arizona which were managed by Private Wealth Advisors in the Scottsdale branch.
>
> 26. After the Krivulkas changed their residence and domicile to Arizona, they also registered the majority of their motor vehicles in Arizona.

12

A-0863-20

27. The Krivulkas purchased and moved into their second Arizona residence in 2011, continuing to make Arizona their permanent home and domicile.

28. As with their first Arizona residence, the Krivulkas took title to their second Arizona residence as community property with rights of survivorship.

29. And, in 2015 when they purchased an airplane, it was registered and hangered in Arizona.

In the federal court action, Mrs. Krivulka alleged that Lowenstein's nondisclosure of the March 8, 2016 Memorandum amounted to malpractice and breach of duty because the firm failed to advise her, the firm's client, that estate planning as an Arizona resident would benefit her. Mrs. Krivulka further alleged that Lowenstein misled her and mishandled the Estate by directing her to list Mr. Krivulka's New Jersey address on his death certificate, rather than his Arizona address, without explaining the implications on the Estate. Additionally, Mrs. Krivulka claimed that Lowenstein presented the March 2018 "engagement letter to her for signature during the Arizona meeting as a fait accompli," without discussing "any issues or conflicts that existed at the time or that might arise from Lowenstein's joint representation of both of them, or, for that matter, any of the substance of the engagement letter."

On July 30, 2021, the United States District Court for the District of New Jersey dismissed Mrs. Krivulka's federal court action against Lerner and

A-0863-20

Lowenstein for lack of subject matter jurisdiction. <u>Krivulka v. Lerner</u>, No. 2:20-cv-09724, 2021 U.S. Dist. LEXIS 142470, at \*15-16 (D.N.J. July 30, 2021). Specifically, the court found diversity jurisdiction did not exist because Mr. Krivulka, Lerner, and Lowenstein were all domiciled in New Jersey, and thus the complete diversity requirement was not satisfied. <u>Ibid.</u>

Mrs. Krivulka's Arizona Lawsuit, however, survived a motion to dismiss filed by Lerner and proceeded to discovery. <u>Krivulka v. Lerner</u>, Case No. CV2020 008668, (Superior Court of Arizona, Maricopa County). At this time, the Arizona case appears to remain open.[3]

Between Mrs. Krivulka filing her Arizona complaint on July 24, 2020, and her federal court complaint on July 30, 2020, Lerner exercised his power under Mr. Krivulka's Will to appoint a third co-executor, selecting Harriet Derman, a former Chancery Division and Probate Part judge. On August 12, 2020, Derman filed a complaint in the Monmouth County Probate Part, seeking "confirmation by the [c]ourt, pursuant to <u>R[ule]</u> 4:95-2,[4] that any majority (here, two out of

---

[3] Judicial Branch of Arizona, Maricopa County, Case No. CV2020-008668: http://www.superiorcourt.maricopa.gov/docket/CivilCourtCases/caseInfo.asp? Case Number (last visited August 22, 2022).

[4] <u>Rule</u> 4:95-2 provides, "A summary action pursuant to <u>R.</u> 4:83 may be brought by executors, administrators, guardians or trustees for instructions as to the

14

A-0863-20

three) of the [c]o-[e]xecutors may authorize and direct the use of funds or other assets of the Estate to pay any administration expenses of the Estate deemed appropriate by a majority of the [c]o-[e]xecutors."  Additionally, Derman requested the probate judge enter an order to show cause granting interim relief, including authorizing any majority of the co-executors to authorize and direct the use of funds or other assets of the Estate to pay fees to defense counsel in Mrs. Krivulka's Arizona Lawsuit against the Estate, an accounting firm that did work for the Estate, and Derman's lawyers.  Lerner joined Derman in making this request.

In September 2020, Lerner moved to dismiss or stay the Arizona Lawsuit, attaching in support of the motion a version of the March 2016 Memorandum from Lowenstein's files that appears to be annotated with Mr. Krivulka's handwriting.  Based on one of Mr. Krivulka's handwritten notes on that document, Lerner argued that Mr. Krivulka had instructed Lowenstein to ignore his living in Arizona in favor of keeping his "residence" in New Jersey.

On October 7, 2020, Mrs. Krivulka answered Derman's complaint; on the same date, she also filed a motion to disqualify Lowenstein from further

---

exercise of any of their statutory powers as well as for advice and directions in making distributions from the estate."

representation of Lerner in connection with the administration of the Estate. At oral argument on the motion, Mrs. Krivulka argued the probate judge should disqualify Lowenstein from representing Lerner because the firm "is now advancing and advocating positions on behalf of Mr. Lerner, its current client, which are materially and diametrically adverse" to her interests regarding the Estate and "the assets of her late husband." Mrs. Krivulka asserted that Lowenstein taking these positions is impermissible because she "never gave an informed consent" to such "adverse representation of Mr. Lerner." Mrs. Krivulka further argued that in other cases, "courts have not hesitated to disqualify counsel who have been participating for two, three years when" required by the RPCs; in addition, she argued that disqualification would not cause "any meaningful prejudice" to Lerner because the Estate is not so complicated that new counsel could not "get up to speed" in a short time, as co-executor Derman had done.

After hearing argument, the probate judge denied Mrs. Krivulka's disqualification motion, explaining that such a remedy should be used "sparingly and with great discretion . . . and applications for disqualifications should be reviewed by a court with a really high standard of proof." The judge added, "if there is a clear confliction of interest, obviously under RPC 1.9(a), the [c]ourt

16

should order a disqualification"; however, the judge did not "really see [such a conflict] here."  The judge found no conflict of interest, "in light of the retainer agreement," which the judge stated "anticipated this very circumstance.  That was the letter that [Mrs. Krivulka] agreed to."  Moreover, the judge noted, "even if there was a conflict, . . . in light of  [Mrs. Krivulka's]  limited interaction with Lowenstein, in light of the fact that . . . Lowenstein was communicating with her husband, Joseph, primarily, which is apparently acknowledged," the judge did not find "any circumstance [where] confidential information [was] exchanged."

Additionally, the judge stated he was "extraordinarily concerned with what is alleged to be a conflict that has existed for literally years," noting that Mrs. Krivulka "raised an issue in April of 2018," when she questioned the engagement letter, but then "proceeded to be represented for years by the law firm of Cravath Swain and Moore" and "[n]ever raised any issues with reference to a conflict on behalf of the Lowenstein firm for two-and-a-half years."  The judge further noted that Mrs. Krivulka, as co-executor, "approved disbursements of significant legal fees . . . to Lowenstein[,] [s]o she knew of Lowenstein's representation."  Citing Alexander v. Primerica Holdings, Inc., 722 F. Supp. 1099 (D.N.J. 1993), the judge stated that motions to disqualify must be made

17

"expediently" when a conflict is known, and Mrs. Krivulka "sitting on an alleged conflict for two-and-a-half years while this complex piece of litigation is going forward is not the kind of expedient application that should have been made." In response to Mrs. Krivulka's argument that the Estate was not so complex such that Lerner would be prejudiced by switching counsel, the judge stated this is "a complex estate."

That same day, October 23, 2020, the judge memorialized his decision by entering an order denying Mrs. Krivulka's motion to disqualify Lowenstein. The judge also entered a final judgment confirming that a majority of the co-executors may authorize and pay "any administration expenses of the Estate deemed appropriate by a majority of the [c]o-[e]xecutors . . . ." The entry of the final judgment resolved all remaining issues raised and enabled Mrs. Krivulka to file an appeal as of right, pursuant to Rule 2:2-3(a)(1), challenging the denial of her motion to disqualify Lowenstein from further representation of Lerner in connection with the administration of the Estate.

Before this court decided Mrs. Krivulka's appeal, further litigation resulted in the entry of the additional orders under review. In May 2021, Mrs. Krivulka filed an amended complaint in the Arizona Lawsuit, expanding her claims against the Estate to include a purported prenuptial agreement entered

A-0863-20

into in 2005, shortly before Mr. and Mrs. Krivulka's wedding in Mexico on March 26, 2005. The prenuptial agreement provided that all assets obtained by Mr. and Mrs. Krivulka after their marriage will belong to the marital partnership. Based upon the prenuptial agreement and the claim that Arizona became the couple's residence and domicile in 2009 – "at the latest" – Mrs. Krivulka's amended complaint repeated her claim that "the vast majority (if not the entirety)" of the Estate's assets are community property.

Within the same week, co-executors Derman and Lerner filed a verified complaint in the Monmouth County Probate Part seeking the removal of Mrs. Krivulka as co-executor "because of her efforts to obtain all or substantially all of the Estate's assets for her personal assets." The complaint also requested a "declaratory judgment as to how (if at all) an alleged Mexican marriage and alleged Mexican prenuptial agreement may affect the New Jersey administration of this New Jersey Estate."[5]

On June 28, 2021, Mrs. Krivulka responded to the verified complaint by filing a motion both to dismiss the complaint in its entirety and to compel both

_____

[5] According to Derman and Lerner, they filed the declaratory judgment action to confirm the validity of Mr. and Mrs. Krivulka's marriage because Mrs. Krivulka based her Arizona Lawsuit on their 2005 marriage in Mexico, even though that marriage ceremony occurred the year before Mr. Krivulka's previous marriage was annulled in 2006.

A-0863-20

net income and interim distributions. Mrs. Krivulka also filed another motion to disqualify Lowenstein, again alleging conflict of interest under RPC 1.9(a). The sole basis for the second disqualification motion was the verified complaint that Lowenstein filed on behalf of Lerner and Dermer against Mrs. Krivulka, its former client.

On September 3, 2021, the probate judge entered orders denying Mrs. Krivulka's motions, including her second motion to disqualify Lowenstein, and granting the motion filed by Lerner and Dermer, removing Mrs. Krivulka as co-executor. The judge also ordered that Lerner and Dermer "are not required to make any interim distribution from the Estate."

Mrs. Krivulka subsequently sought and received leave to appeal the orders that removed her as co-executor, denied her second disqualification motion, and denied her motion to compel payment of net income and interim distributions. As noted, we consolidated both appeals on November 18, 2021.

II.

"[A] determination of whether counsel should be disqualified is, as an issue of law, subject to de novo plenary appellate review." City of Atlantic City v. Trupos, 201 N.J. 447, 463 (2010); see also Greebel v. Lensak, 467 N.J. Super.

251, 257 (App. Div. 2021) ("We review a decision on a disqualification motion de novo.").

"In evaluating motions for the disqualification of counsel for an adversary pursuant to this RPC," courts must "balance competing interests, weighing the need to maintain the highest standards of the profession against a client's right freely to choose his counsel." Twenty-First Century Rail Corp. v. N.J. Transit Corp., 210 N.J. 264, 273-74 (2012) (quoting Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 218 (1988)). However, "to strike that balance fairly, courts are required to recognize and to consider that 'a person's right to retain counsel of his or her choice is limited in that there is no right to demand to be represented by an attorney disqualified because of an ethical requirement.'" Id. at 274.

Motions for disqualification

> should ordinarily be decided on the affidavits and documentary evidence submitted, and an evidentiary hearing should be held only when the court cannot with confidence decide the issue on the basis of the information contained in those papers, as, for instance, when despite that information there remain gaps that must be filled before a factfinder can with a sense of assurance render a determination, or when there looms a question of witness credibility.
>
> [Ibid. (quoting Dewey, 109 N.J. at 222).]

A-0863-20

Parties seeking disqualification initially bear the burden of production to show that the attorneys previously represented them "and that the present litigation is materially adverse to [their] interests . . . ." Trupos, 201 N.J. at 462. If the movants make that showing, "the burden shifts to the attorneys sought to be disqualified to demonstrate that the matter or matters in which . . . they represented the former client are not the same or substantially related to the controversy in which the disqualification motion is brought." Id. at 463. Still, "the burden of persuasion on all elements under RPC 1.9(a) remains with the moving party, as it 'bears the burden of proving that disqualification is justified.'" Ibid. (quoting N.J. Div. of Youth and Fam. Servs. v. V.J., 386 N.J. Super. 71, 75 (Ch. Div. 2004)).

RPC 1.7 (a)(1) and (2) provide that an attorney shall not represent a client if "the representation of one client will be directly adverse to another client," or "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer." However, a lawyer may represent a client, notwithstanding the existence of a concurrent conflict of interest, if:

> (1) each affected client gives informed consent, confirmed in writing, after full disclosure and consultation . . . .

When the lawyer represents multiple clients in a single matter, the consultation shall include an explanation of the common representation and the advantages and risks involved;

(2) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(3) the representation is not prohibited by law; and

(4) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.

[RPC 1.7(b)]

In a similar manner, RPC 1.8 provides that "a lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client after full disclosure and consultation, gives informed consent."

RPC 1.9 concerns attorneys' "[d]uties to former clients" and resulting conflicts of interest. RPC 1.9(a) provides, "A lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing." RPC 1.10 imputes an attorney's conflict of interest under RPC 1.9 onto other lawyers in his or her firm:

23

When lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by RPC 1.7 or RPC 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

[RPC 1.10(a).]

Our Supreme Court has stated RPC 1.9(a)'s "prohibition is triggered when two factors coalesce: the matters between the present and former clients must be 'the same or . . . substantially related,' and the interests of the present and former clients must be 'materially adverse.'" Trupos, 201 N.J. at 462. Thus, Lowenstein's representation of Lerner violates RPC 1.9 if 1) the firm's representation is in the same or substantially the same matter where it represented Mrs. Krivulka; 2) the interests of Lerner and Mrs. Krivulka are materially adverse; and 3) Mrs. Krivulka did not give her written informed consent to Lowenstein's representation of Lerner.

Our Supreme Court has provided the standard for determining whether matters are substantially related, triggering the prohibition set forth in RPC 1.9(a):

[F]or purposes of RPC 1.9, matters are deemed to be "substantially related" if (1) the lawyer for whom disqualification is sought received confidential

24

> information from the former client that can be used against that client in the subsequent representation of parties adverse to the former client, or (2) facts relevant to the prior representation are both relevant and material to the subsequent representation.
>
> [Twenty-First Century Rail, 210 N.J. at 274-75 (2012) (alteration in original) (quoting Trupos, 201 N.J. at 467).]

While such analysis is necessary to determine whether matters are substantially related, the Court later clarified that when counsel's prior representation of the adverse former client is in the same matter, courts "need not conduct the inquiry into whether the matters are substantially related that we deemed necessary to undertake in Trupos. Nor need [they] apply the Trupos two-part test that includes the consideration of whether client confidences were communicated to the lawyer." Id. at 276.

Mrs. Krivulka asserts two conflicts arising from Lowenstein's representation of her: 1) Lowenstein's representation of her as co-executor of the Estate along with Lerner from March 2018 until July 2018, i.e., in the same matter, and 2) Lowenstein's representation of Mr. and Mrs. Krivulka in their estate planning matters, beginning in 2009, which Mrs. Krivulka asserts is substantially related to the matter under review, the administration of Mr. Krivulka's Estate.

25

Mrs. Krivulka correctly states that Lowenstein's representation of Lerner as co-executor is the same matter where Lowenstein represented her, for a short time, as co-executor. Indeed, Lowenstein began representing Mrs. Krivulka and Lerner together as co-executors when they both signed the March 19, 2018 engagement letter. However, since Lerner and Mrs. Krivulka retained Lowenstein's services simultaneously and jointly, as co-executors, Lerner argues that Mrs. Krivulka does not qualify as a former client under RPC 1.9(a). The rule states, "A lawyer who has represented a client in a matter shall not <u>thereafter</u> represent another client in the same . . . matter in which that client's interests are materially adverse to the interests of the former client . . . ." RPC 1.9(a) (emphasis added). Because Lowenstein's representation of Lerner as co-executor did not commence <u>after</u> its representation of Mrs. Krivulka, Lerner argues that Lowenstein continuing to represent him after Mrs. Krivulka retained new counsel cannot be considered a prohibited subsequent representation under RPC 1.9(a).[6]

---

[6] Even if RPC 1.9(a) did not apply here to require disqualification, Lowenstein's continued representation of Lerner would be barred under RPC 1.7(a) as a concurrent conflict of interest, absent "informed consent, confirmed in writing, after full disclosure and consultation." RPC 1.7(b)(1).

Lerner's argument requires this court to narrowly focus on the representation of Mrs. Krivulka and Lerner as co-executors of the Estate, and ignore the fact that Mrs. Krivulka was already an existing client[7] of Lowenstein, going back nine years. Regardless, the record clearly reflects that the estate planning services provided to Mr. and Mrs. Krivulka, beginning in 2009, are substantially related to the ongoing administration of the estate of which Lerner is a co-executor. Certainly, facts relevant to the estate planning representation "are both relevant and material to the subsequent representation." Twenty-First Century Rail, 210 at 274-75 (quoting Trupos, 201 N.J. at 467).

We note that in Trupos the Court indicated that a mere similarity between the issues in the two matters does not render them substantially related. See 201 N.J. at 469. Rather, to be substantially related, facts dispositive in the first matter must too be dispositive in the second. Our recent decision in Greebel, 467 N.J. Super. at 255-59, is instructive.

Greebel involved a disqualification motion made based on an attorney's alleged conflict under RPC 1.18, which provides, in pertinent part:

---

[7] That Mrs. Krivulka was already an existing client of Lowenstein, before she signed the engagement letter, is shown by the fact that on February 18, 2018, the day after Mr. Krivulka died, Lerner directed Mrs. Krivulka to list the Krivulks' New Jersey address on the death certificate, rather than their Arizona address.

a) A lawyer who has had communications in consultation with a prospective client shall not use or reveal information acquired in the consultation, even when no client-lawyer relationship ensues, except as RPC 1.9 would permit in respect of information of a former client.

b) A lawyer subject to paragraph (a) <u>shall not represent a client with interests materially adverse to those of a former prospective client in the same or a substantially related matter</u> if the lawyer received information from the former prospective client that could be significantly harmful to that person in the matter . . . .

[(emphasis added).]

The plaintiff in <u>Greebel</u> consulted with Celli, an attorney, in 2005 "about her right to financial support from defendant [boyfriend] if the parties ever ended their relationship without marrying." 467 N.J. Super. at 255. The plaintiff revealed various details and concerns about the parties' relationship, finances, assets, and lifestyles. <u>Ibid.</u> In 2014, using a different attorney, the plaintiff filed a palimony complaint against the defendant, leading the defendant to hire Celli as his attorney. <u>Ibid.</u> This court found a violation of RPC 1.18 and disqualified Celli, finding, relevant here, that the plaintiff's 2014 palimony suit was a substantially related matter to the plaintiff's 2005 consultation with Celli. <u>Id.</u> at 258-59. A substantial relation existed because the information plaintiff revealed

28

during the consultation would be dispositive and relevant to the outcome of the palimony litigation, which turns on the parties' relationship and finances. Ibid.

The record clearly reflects that the facts relevant to Mrs. Krivulka's estate planning, which Lowenstein handled, are relevant and material to Lerner's administration of the Estate, where Lowenstein represents Lerner. Mr. and Mrs. Krivulka's marriage was relevant to both of their estate planning. Certain facts about their marriage, including assets and residency, necessarily impacted and encompassed both their estates. The nature, domicile, and assets of their marriage is now both relevant and material to the administration of the Estate because they affect how the Estate will be administered and to whom Estate assets will pass. Mrs. Krivulka's ongoing Arizona Lawsuit, where she seeks to acquire a greater share of marital assets, shows the overlap between Mrs. Krivulka's own estate planning and Mr. Krivulka's estate planning and how this previous estate planning affects how the Estate is administered.

Lowenstein represented Mrs. Krivulka in her individual capacity when it helped plan her estate. Mrs. Krivulka's individual interests are materially adverse to Lerner's interests as co-executor of the Estate because she is seeking to receive a greater amount of assets, while Lerner is invested in upholding the estate plan that Lowenstein prepared for Mr. Krivulka, as reflected in his will.

 A-0863-20

The evidence suggests Mr. Krivulka deliberately structured his Estate, and even concealed information from Mrs. Krivulka, so that New Jersey would remain his domicile and certain of his assets would not pass to Mrs. Krivulka as community property. Thus, we are satisfied that Lowenstein's obligations to Mrs. Krivulka, as her estate planning attorney, presented a clear conflict that should have precluded Lowenstein from representing Mrs. Krivulka and Lerner jointly as co-executors.

In short, Lerner's interest in administering Mr. Krivulka's Estate consistent with his will is clearly adverse to Mrs. Krivulka's individual interest to obtaining the maximum financial benefit from the Estate. There is thus a coalescence of Lowenstein's representation of Mrs. Krivulka in a substantially related matter to the matter in which it currently represents Lerner. The material adversity between Mrs. Krivulka's individual interest as a beneficiary of decedent's Estate and Lerner's interest in administering the Estate, clearly triggered the prohibition of RPC 1.9(a).

As noted, however, RPC 1.9(a) permits an attorney to represent a new client with materially adverse interests to the attorney's former client in the same or substantially related matter to the former representation if "the former client gives informed consent confirmed in writing." RPC 1.0(e) provides,

30

"'[i]nformed consent' denotes the agreement by a person to a proposed course of conduct <u>after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct</u>." (emphasis added). <u>See also</u> <u>In re Grand Jury Investigation</u>, 200 N.J. 481, 495 (2009) (offering the same definition for "informed consent").

Relatedly, RPC 1.4(c) provides, "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Regarding an arbitration provision in a retainer agreement, the Supreme Court recently stated, "an attorney has a professional obligation to explain the content of a retainer agreement 'to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.'" <u>Delaney v. Dickey</u>, 244 N.J. 466, 471 (2020) (quoting RPC 1.4(c)). The Court made clear that "RPC 1.4(c)'s mandate . . . applies to every provision of a retainer agreement, not just an arbitration provision." <u>Id.</u> at 494.

Mrs. Krivulka contends she never gave informed consent to permit Lowenstein to engage in its conflicted representation of Lerner. She primarily asserts her signing of the engagement letter, which included a conflict of interest waiver, was not done with informed consent because Lowenstein failed to

disclose the existing conflicts related to Lowenstein's prior representation of Mrs. Krivulka.

Mrs. Krivulka's argument that she did not provide her informed consent to waive the conflict has merit. Mrs. Krivulka certified that Lowenstein did not advise her "of any conflicts of interest, or any actual or potential adversity of interest between me and Mr. Lerner" or "of any actual or potential conflicts the law firm itself might have in representing me, Mr. Lerner and my late husband's businesses in which Mr. Lerner had an interest." She also certified that Lowenstein "did not ask me then, and has never asked me subsequently, to consent to the Lowenstein's continuing representation of Mr. Lerner regarding the Estate if conflicts between him and me develop and/or previously-existing conflicts came to my attention." We are satisfied that Lowenstein did not adequately explain to Mrs. Krivulka the risks of waiving the conflicts and of joint representation.

Lowenstein's engagement letter specifically identified the firm's obligation to "obtain informed written consent to such joint representation . . . after full consultation and disclosure." Notwithstanding this acknowledgment, the record contains no credible evidence that any such meaningful consultation or disclosure occurred. Apart from the issues of the Krivulkas' residence and

32

domicile, the record contains no evidence that anyone from Lowenstein explained to Mrs. Krivulka that she and Lerner were not equal co-executors since Mr. Krivulka's will granted Lerner the power to appoint additional co-executors.[8]

Since a client's consent is not informed until her attorney adequately explains "a matter to the extent reasonably necessary to permit the client to make informed decisions," RPC 1.4(c), as well as the material risks and reasonable alternatives, RPC 1.0(e), we are satisfied that Mrs. Krivulka's signing of the engagement letter did not constitute her informed consent to the conflicted representation. The certifications of Lerner or Berger do not assert they explained the risks of the joint representation or how potential conflicts might arise. They were required to do so to ensure that Mrs. Krivulka made her waiver of the conflict with informed consent. Without such an explanation, it cannot be said that Mrs. Krivulka's consent in signing the agreement was informed. Therefore, we conclude that Lowenstein failed to obtain an effective informed

---

[8]    The failure to explain the implications of Lerner's unilateral authority to appoint additional co-executors is significant because, as happened, Lerner could exercise that authority to preclude Mrs. Krivulka from vetoing any proposed action as one of two co-equal executors. Lowenstein failed to make sure that Mrs. Krivulka understood that her voting authority could be diluted by Lerner's appointment of additional co-executors.

33

consent in writing from Mrs. Krivulka before proceeding to represent Mrs. Krivulka and Lerner jointly.

Lowenstein argues that even if an effective informed consent was not obtained from Mrs. Krivulka, she waived her right to seek disqualification through undue delay in bringing the motion.  Citing federal cases, Lowenstein asserts that "the most basic rule of disqualification law is that a disqualification motion must be made at the time when the alleged conflict of interest arises . . . ."

Lowenstein specifically argues this court should apply the factors employed by the federal court in Alexander v. Primerica Holdings, Inc., 722 F. Supp. 1099, 1115 (D.N.J. 1993) to assess whether a party moving for disqualification has waived its right to make such a request:  "(1) the length of the delay in bringing the motion to disqualify, (2) when the movant learned of the conflict, (3) whether the movant was represented by counsel during the delay, (4) why the delay occurred and (5) whether disqualification would result in prejudice to the non-moving party."  Lowenstein contends all five of these factors favor forgoing disqualification.  Derman too argues the Alexander factors should be applied, focusing on the fifth factor.  She contends disqualifying Lowenstein would impart "substantial prejudice" on the Estate due

A-0863-20

to the enormous amount of time Lowenstein has already invested in administering such a complex Estate.

No published New Jersey cases have applied the five <u>Alexander</u> factors and we are not persuaded to do so here.[9] In <u>Twenty-First Century Rail</u>, the Court expressed disapproval of the trial court's alternative rationale for denying disqualification, which specifically cited <u>Alexander</u>, that any conflict would have been waived because of delay in bringing the disqualification motion. <u>See</u> 210 N.J. at 272, n. 4. Even though the trial court's alternative holding as to waiver was not technically before it, the Court nonetheless felt "constrained to comment on the trial court's alternative analysis" and rejected it on multiple grounds, including that "waiver is an insufficient basis" for denying such a motion "in the absence of extraordinary circumstances." 210 N.J. at 278, n. 6.

---

[9] We note that not all federal courts have followed <u>Alexander</u>. In <u>CenTra, Inc. v. Estrin</u>, 538 F.3d 402, 417 (6th Cir. 2008), the Sixth Circuit expressed its disapproval of <u>Alexander</u>:

> One court has placed more of a burden on the client. <u>See</u> <u>Alexander v. Primerica Holdings, Inc.</u>, 822 F. Supp. 1099, 1116 (D.N.J. 1993) (holding that it was sufficient that the client had "the knowledge necessary to <u>discern</u> these conflict of interest issues . . . ." (emphasis added)). However, we could find no other courts that have adopted this watered-down standard . . . .

A-0863-20

Rather than applying the five <u>Alexander</u> factors, New Jersey published opinions have recognized that undue delay may amount to "extraordinary circumstances" justifying permitting a conflicted firm to continue representation. <u>Barnes v. R.J. Reynolds Tobacco Co.</u>, 246 N.J. Super. 348, 352 (App. Div. 1991) (citing <u>Dewey v. R.J. Reynolds Tobacco Co.</u>, 109 N.J. 201, 218-21 (App. Div. 1988)); <u>see also</u> <u>Chattin v. Cape May Greene, Inc.</u>, 243 N.J. Super. 590, 609 (App. Div. 1990) (citing <u>Dewey</u>, 109 N.J. at 219) (finding the trial "court did not abuse its discretion in denying CMG's motion to disqualify the homeowners' counsel, because CMG unduly delayed raising the issue until shortly before the retrial, even though it was aware of the facts relevant to the alleged conflict for several years.").

In <u>Dewey</u>, after serving as co-counsel for three years, the plaintiff's firm hired an attorney that previously worked in one of the defendants' firms. 109 N.J. at 207. The defendant moved for the conflicted firm's disqualification. <u>Id.</u> at 208. Ultimately, the Supreme Court determined the firm should not be disqualified because it "had expended more than 1,800 hours preparing this case for trial" and deposed thirty-six witnesses. <u>Id.</u> at 218-19. The Court questioned "whether at this late date, with trial fast approaching, another attorney could effectively master the complicated technical aspects of the case entrusted to him,

A-0863-20

or whether another attorney could develop the knowledge of and personal relationship with the various witnesses and with the plaintiff herself." Id. at 219. Recognizing "that a person's right to retain counsel of his or her choice is limited in that 'there is no right to demand to be represented by an attorney disqualified because of an ethical requirement[,]'" the Court ultimately concluded "that an order disqualifying counsel on the eve of trial would do more to erode the confidence of the public in the legal profession and the judicial process than would an order allowing the firm to continue its representation of the plaintiff." Id. at 218-19 (quoting Reardon v. Marlayne, Inc., 83 N.J. 460, 477 (1980)).

However, the Dewey Court notably conditioned the conflicted firm's continued representation "to be furnished without compensation for any services to be rendered henceforth, particularly including any services in connection with trial or other final disposition of the matter." Id. at 219. This was necessary to admonish the conflicted firm for failing to address:

> the obvious ethical implications of their association that has created the awkward situation now confronting us - - a failure that but for the Court's overriding concern for the firm's client would result in immediate compelled withdrawal of the firm from this case. We cannot undo the conflict that has preceded our disposition of the matter, nor can we correct the tainted representation without unduly harming the client; but we can prevent those responsible for this sorry state of affairs from profiting from their disregard of the RPCs.

A-0863-20

[Id. at 219-20.]

Barnes involved a conflict similar to Dewey and closely related circumstances, as both cases were part of multi-party products liability suits against tobacco companies. 246 N.J. Super. at 350-51. The conflicted attorney in this case had "established an extremely close bond with all the plaintiffs," "spent between 500 and 600 hours working on depositions," "spent thousands of hours reviewing documents," and had "significant expertise in the field of addiction which no other attorney for the plaintiffs possesses or could readily develop." Id. at 354-55. Further, the conflicted attorney's co-counsel credibly testified that it would not be able to proceed without the attorney's assistance and that no other firm would be able or willing to substitute representation. Id. at 355. However, unlike Dewey, the motion to disqualify the conflicted attorney was not made right before trial. Declining to disqualify the conflicted attorney, this court clarified,

> we do not read Dewey to say that a court's obligation to balance the adverse effect upon the legal . . . and a client's interest in retaining his or her attorney is limited to cases which are "on the eve of trial." Rather, the proximity of a trial date should be considered together with all other relevant circumstances in determining whether disqualification is required.

[246 N.J. Super. at 356.]

38

Though the court found "compelling circumstances" to permit further conflicted representation, it again imposed the limitation that "that the representation should be provided without any compensation for services rendered subsequent to the date of the decision . . . ." Id. at 356-57.

An adverse impact on the client alone does not constitute exceptional circumstances warranting the denial of a disqualification motion. In G.F. Industries v. American Brands, 245 N.J. Super. 8, 16-17 (App. Div. 1990), this court acknowledged the affected client would be adversely impacted by the disqualification of multiple attorneys, but stated, "anything short of disqualification would tend to undermine the 'high ethical standards which the Supreme Court of this State has sought so diligently to uphold.'" Id. at 17.

Additionally, we note the delay in seeking Lowenstein's disqualification was not inexplicable. While Mrs. Krivulka knew of Lowenstein's past representation of her and her husband, she did not become an adversary of Lowenstein until she filed the Arizona Lawsuit and federal complaints against Lerner and Lowenstein in July/August 2020, only two months before she filed her disqualification motion. Any alleged undue delay in the filing of these complaints and the disqualification motion was the direct result of Lowenstein obtaining written consent to its concurrent representation of Lerner and Mrs.

 A-0863-20

Krivulka without first providing Mrs. Krivulka with the "full disclosure and consultation" required by Rule 1.7(b)(1).

In denying Mrs. Krivulka's disqualification motion, the probate judge cited the timing of the motion as delayed for "two and a half years while this complex piece of litigation [was] going forward." The judge's finding of undue delay ignored the showing in the record that crucial evidence – such as Mr. Krivulka's handwritten notes found in Lowenstein's files which appear to instruct Lowenstein to pursue a strategy directly adverse to Mrs. Krivulka's interests at a time when she was a Lowenstein client – was not known to Mrs. Krivulka or her counsel until the month before Mrs. Krivulka filed her first disqualification motion. Just as importantly, there had been no "complex piece of litigation" ongoing for two and a half years. No litigation between the parties existed before July 2020. The verified complaint of co-executor Derman, seeking judicial intervention in various potential disputes among the co-executors was not filed in the Probate Part until August 12, 2020, less than two months before the disqualification motion was filed. Moreover, her application did not involve a "complex piece of litigation." The probate judge inexplicably characterized estate administration as "litigation," something it is not. While the interests of a plaintiff and a defendant are obviously adverse from the

40 <span>A-0863-20</span>

moment a lawsuit is filed, the interests of co-executors of the same estate are not inherently adverse.

The bottom line is Lowenstein did not take care to avoid potential conflicts when it jointly represented Mr. and Mrs. Krivulka in their estate planning; instead, Lowenstein failed to provide Mrs. Krivulka important information regarding the impact of state residence and domicile, information that Mr. Krivulka received but Mrs. Krivulka did not. The record contains no explanation for this disparate treatment by Lowenstein.

Thereafter, it was inappropriate for Lowenstein to represent the co-executors of the Estate where doing so would be foreseeably adverse to its existing estate-planning client, Mrs. Krivulka. The record contains no credible evidence that Lowenstein provided Mrs. Krivulka with the "full disclosure and consultation," required by RPC 1.7(b)(1), before the firm began its joint representation of Mrs. Krivulka and Lerner as co-executors. Without providing Mrs. Krivulka with the required full disclosure and consultation, Lowenstein could not have "reasonably believe[d]" it would "be able to provide competent and diligent representation to each affected client," as required by RPC 1.7(b)(2).

41

We do not find exceptional circumstances warranting the denial of Mrs. Krivulka's disqualification motion. Unlike the "extraordinary circumstances" that justified permitting a conflicted firm to continue representation in Dewey and Barnes, the fact situation here is far different.

In Dewey, the disqualification motion came with "trial fast approaching," 109 N.J. at 219, while in Barnes the trial court found that there was no able or willing substitute counsel available. 246 N.J. Super. at 355. In both cases, however, the conflicted attorneys were only permitted to continue without further compensation.

The circumstances presented in Dewey and Barnes are not repeated here. Because the remaining co-executors are very experienced lawyers and Lerner has been involved with the Estate administration from day one, and co-executor Derman has been represented by her own very experienced counsel for over one year, we do not find "extraordinary circumstances" that would justify permitting Lowenstein to continue representing Lerner or the Estate. Fortunately, Lerner's service as co-executor and a Lowenstein partner should provide him with extensive institutional knowledge that will prove helpful to the completion of the administration of the Estate.

A-0863-20

### III.

We review a trial judge's removal of a trustee, executor, or fiduciary under the abuse of discretion standard. An application for removal of a fiduciary "is one which involves the exercise of sound discretion" that "will not be disturbed by an appellate tribunal in the absence of manifest abuse." Wolosoff v. CSI Liquidating Trust, 205 N.J. Super. 349, 360 (App. Div. 1985) (citing 2 Scott on Trusts, 3d Ed. 1967). A proper exercise of discretion "implies conscientious judgment and not arbitrary action." Id. at 363 (citing In re Koretzky, 8 N.J. 506, 535 (1951)).

Based upon the record, we agree with the probate judge that the co-executors had the right to secure Mrs. Krivulka's removal as co-executor once her actions became inconsistent with her obligations to the estate. Semler v. CoreStates Bank, 301 N.J. Super. 164, 175 (App. Div. 1997) (citing In re Koretzky, 8 N.J. 506 and Wolosoff, 205 N.J. Super. at 362.)

Here, it was undisputed that Mrs. Krivulka's Arizona Lawsuit asserted new personal claims that placed her in an adversary role to the Estate. The judge acted well within his discretion in deciding that Mrs. Krivulka could not continue on both sides of the Arizona Lawsuit she filed against the Estate. Although Mrs. Krivulka asserts that she "voluntarily recused herself, as co-

43

executor, from any consideration of how the Estate should defend or otherwise respond to the Arizona [Lawsuit]," her recusal does not eliminate the fact that she has asserted claims that have negatively impacted the Estate, even if her lawsuit proves unsuccessful. We are satisfied the probate judge properly applied his broad discretion, as well as long-settled law, including In re Kolbeck's Est., 27 N.J. Super. 135 (App. Div. 1953), in reaching its decision to remove Mrs. Krivulka as co-executor.

In Kolbeck, a beneficiary was both a beneficiary and an executor, who asserted a claim to "very nearly" all the assets in the name of the estate (there, by claiming that a mortgage owned by the decedent was actually owned jointly, and thus not an asset of the estate). Id. at 137. In that situation, we held that it was reversible error for the trial court not to remove the executor. Id. at 137. In July 2020, Mrs. Krivulka filed her Arizona Lawsuit, claiming for the first time that all or virtually all of the Estate's assets belonged to her. In March 2021, Mrs. Krivulka expanded her claims against the Estate in the Arizona Case; this time, to include a Mexican prenuptial agreement dating back to March 2005. In the Arizona Complaint, as now amended and expanded, Mrs. Krivulka continues to assert that "the vast majority (if not the entirety)" of the Estate's assets are community property.

In exercising its discretion to remove Mrs. Krivulka as co-executor, the probate judge, citing Kolbeck, 27 N.J. Super. at 137, explained that "an executor who has a fiduciary obligation and duty to all of the beneficiaries can't be doing battle with the very estate that she is a co-executor on." The judge correctly found that Mrs. Krivulka, by suing the Estate, "placed herself in a position where she is in an absolute conflict and couldn't appropriately and/or legitimately carry out" fiduciary duties when she was pursuing "personal claims . . . to the detriment of the other beneficiaries" and "at odds . . . with the [E]state itself."

## IV.

A fiduciary, acting as executor, has broad statutory powers to administer the estate "in the exercise of good faith and reasonable discretion[.]" N.J.S.A. 3B:14-23. The duty of a fiduciary is to "exercise that degree of care, prudence, circumspection and foresight that an ordinary prudent person would employ in like matters of his own." In re Koretzky's Estate, 8 N.J. 506, 524 (1951).

Mrs. Krivulka contends the probate judge's refusal to order net income distributions to her "was based on its erroneous reading of clear language in the [w]ill and [t]rust [a]greement as well as the language of the controlling New Jersey statutes and federal tax regulations . . . ." We disagree.

Initially, we note that the co-executors do not dispute that Mrs. Krivulka "will be entitled to receive distributions of net income," if any, from the marital trust and revocable trust established by Mr. Krivulka once the trusts are funded. We agree with the co-executors that, pursuant to N.J.S.A. 3B:19B-6, they have the right not to distribute estate income to a revocable trust, marital trust, or other beneficiary of an estate until they can determine the value of the estate and set a "distribution date" for actual distributions. As a result of Mrs. Krivulka's Arizona Lawsuit, which asserts claims to virtually all the Estate's assets and has resulted in significant administrative expenses and tax uncertainties, the co-executors cannot yet know whether the Estate will have assets to fund the trusts. Given these facts and circumstances, we discern no basis to disturb the order denying the motion to compel the co-executors to make interim distributions to Mrs. Krivulka.

Any arguments not addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed, in part, reversed and remanded, in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0863-20